561 So.2d 263 (1990)
STATE of Florida, et al., Appellants,
v.
Jack P. DODD, Appellee.
No. 75778.
Supreme Court of Florida.
May 8, 1990.
Robert A. Butterworth, Atty. Gen., Mitchell D. Franks, Deputy Atty. Gen., and James A. Peters, Asst. Atty. Gen., and Ken Rouse, General Counsel, Dept. of State, Tallahassee, for appellants.
Terrell C. Madigan of Papy, Weisenborn & Papy, Tallahassee, for appellee.
KOGAN, Justice.
We have on appeal an order of the Circuit Court of the Second Judicial Circuit declaring unconstitutional section 106.08(8), Florida Statutes (1989) (the "Campaign Financing Act"), which has been certified as a matter of great public importance requiring immediate resolution by this Court. State v. Dodd, No. 90-766 (Fla. 1st DCA March 30, 1990). We have jurisdiction. Art. V, § 3(b)(5), Fla. Const.
Appellee Jack Dodd is a candidate for the 1990 Republican nomination as Florida's commissioner of agriculture, a statewide office. In February 1990, Dodd filed a declaratory judgment action against the state alleging that the Campaign Financing Act violates his free speech and associational rights. Dodd sought an injunction preventing the state and others from enforcing the statute, which provides:
A candidate who is running for legislative office or a statewide office, except a candidate for a vacant office being filled by special election, may not accept or solicit any campaign contribution during a regular or special session of the Legislature.
*264 § 106.08(8), Fla. Stat. (1989).[1]
At a hearing, the state argued that the Campaign Financing Act advances governmental interests sufficiently compelling to justify any intrusion upon the rights of free speech and association. These reasons generally consist of avoiding corruption and the appearance of corruption occurring when legislators accept contributions during legislative sessions, a practice whose frequency has prompted an increasing level of condemnation by the press and the public at large. The state also has argued that the statute "focuses" legislators' attention on the legislative process by preventing the distractions of campaign financing.
After weighing the arguments, the trial court found that the effort to prevent corruption or the appearance of corruption was in fact compelling but that the statute was not narrowly tailored so as to employ the least intrusive means available. Thus, the trial court concluded that the statute impermissibly chilled free speech and associational rights. The trial court also found the statute unconstitutionally overbroad and vague.
At this point in time, there is no question that "the use of funds to support a political candidate is `speech'; [and] independent campaign expenditures constitute `political expression "at the core of our electoral process and the First Amendment freedoms."'" Austin v. Michigan Chamber of Commerce, ___ U.S. ___, 110 S.Ct. 1391, 1396, 108 L.Ed.2d 652 (1990) (citations omitted).
Also implicated is the right of free association, article I, section 5, Florida Constitution, which inevitably will be chilled if state action effectively forbids political candidates to raise the wherewithal needed to contact, associate, and assemble with others for the purpose of political discussion and debate. Restrictions on the amount a person or group can spend "necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." Buckley v. Valeo, 424 U.S. 1, 19, 96 S.Ct. 612, 634, 46 L.Ed.2d 659 (1976) (footnote omitted). The right of association is implicated here precisely because "[m]aking a contribution, like joining a political party, serves to affiliate a person with a candidate [and] enables like-minded persons to pool their resources in furtherance of common political goals." Id. at 22, 96 S.Ct. at 636.
Simultaneously, we recognize that the governmental intrusion upon free speech and association occurring in this instance is particularly grave. As the Buckley Court noted,
contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy.
Id. at 21, 96 S.Ct. at 635. In the present case, the Campaign Financing Act does in fact have the effect of cutting off all sources of campaign financing for any period of time in which the legislature is in regular or special session. We note that, under Florida law, there is no limit on the number of special sessions that may occur in any given period of time. Thus, the restriction imposed by the statute potentially is limitless. We recognize, of course, that present custom restricts legislative sessions to no more than two or three months of the year. However, we also must take into account the fact that unusually long or numerous sessions also can occur, particularly when the legislature must reapportion the state's legislative districts, as it must in 1992.
As a result, we believe the present case involves weighty free speech and associational rights protected both by federal and Florida constitutional law. U.S. Const. amend I; Art. I, §§ 4, 5, Fla. Const. Any restrictions the state imposes on the conduct in question must be narrowly tailored to serve a compelling state interest. Austin, 110 S.Ct. at 1396; In re Estate of Greenberg, 390 So.2d 40, 42-43 (Fla. 1980), appeal dismissed, 450 U.S. 961, 101 S.Ct. *265 1475, 67 L.Ed.2d 610 (1981). This "strict scrutiny" test
requires careful examination of the governmental interest ... in order to determine whether that interest is substantial and compelling and requires inquiry as to whether the means adopted to achieve the legislative goal are necessarily and precisely drawn.
Greenberg, 390 So.2d at 42 (citation omitted).
Turning to the "compelling interest" prong of the test, we note that the United States Supreme Court has expressly stated that
preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances.
Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 496-97, 105 S.Ct. 1459, 1468-69, 84 L.Ed.2d 455 (1985) (emphasis added). We thus believe it is beyond question, as the state now argues, that the Campaign Financing Act can be construed as embodying a compelling state interest.
We cannot agree, however, that the statute advances this interest through the least intrusive means.
One of the primary constitutional defects is that the Campaign Financing Act applies to all office-seekers without exception. As a result, it places restrictions on some public officials and candidates who could not possibly be subject to a corrupting quid pro quo arrangement. Dodd, for instance, presently holds no public office. He has no vote or influence to trade for campaign contributions. Similarly, incumbent cabinet officers have only a marginal role in the legislative process: They can neither vote on legislation nor threaten to veto it. Finally, judges facing a merit-retention election have absolutely no role in the legislative process at all. As a result, no quid pro quo would be possible that in any sense relates to the legislative process.
We find other infirmities. To the extent that the statute may be construed as applying to all legislative sessions, we believe the censorship thereby imposed has the potential to be so extreme as to be irremediably unconstitutional. It is possible that the legislature could be called into a series of sessions lasting for huge portions of any given year. In 1982, for instance, public records disclose a long series of sessions extending from January to June as the legislature grappled with the issues of reapportionment, the state budget and insurance reform. See Proclamations of the Governor, 1982 Fla.Laws xiii-xxxii.
In reaching these conclusions, we hasten to note that there may be instances in which the state could articulate a valid compelling interest in prohibiting all kinds of campaign contributions for narrowly defined periods of time in an election year. However, the sheer magnitude and practical impact of the present restriction renders it unconstitutional. Even assuming that a regular legislative session lasts only two months of the year, this is a two-month period in which the Campaign Financing Act halts all sources of financing. During this period, incumbents have virtually unlimited access to the press and free publicity merely by virtue of the public forum they are privileged to occupy. Nonincumbents, however, not only lack such a forum; the Campaign Financing Act also forbids them any means of counterbalancing the decided advantage enjoyed by the incumbents  an advantage that may be crucial in a primary election that typically occurs only three months after a regular session ends.
As the Buckley Court suggested, the rights of free speech and association forbid measures that "prevent[] candidates and political committees from amassing the resources necessary for effective advocacy." Buckley, 424 U.S. at 21, 96 S.Ct. at 635 (emphasis added). We believe that the prohibition at issue here has just such an effect because it cuts off the flow of resources needed for effective advocacy during a crucial portion of the election year.
Moreover, by focusing entirely on the legislative session, the Campaign Financing Act fails to recognize that corrupt campaign practices just as easily can occur *266 some other time of the year. Legislative committees meet throughout the calendar, frequently with the involvement of lobbyists and other special interests. Indeed, much legislation is shaped in the months immediately prior to the regular session, when committees and legislative workshops occur virtually on a continuous basis. If corrupt practices can occur during a session, they also can occur at other times. A quid pro quo arrangement, if one existed, might very well take the form of an under-the-table or tacit I.O.U. to be redeemed after the session ends.
Finally, we also note  as the state concedes  that this statute forbids candidates to contribute to their own campaigns during the times in question. We believe it is specious to argue that any sort of "corruption" or inattention to legislative duties occurs as a result of this practice. Indeed, in this respect the statute is obviously unconstitutional under federal case law. The Buckley Court struck a statute precisely because it prohibited candidates from contributing to their own campaigns. Buckley, 424 U.S. at 53, 96 S.Ct. at 651.
We thus believe that the Campaign Financing Act fails to accomplish its goals through the least restrictive means available, as required by law. Greenberg, 390 So.2d at 42-43. Less restrictive measures obviously exist. For example, certain types of organizations or entities found to be most involved in creating the appearance of corruption could be subject to restrictions similar to those approved in the recent opinion in Austin.[2] Legislators themselves could restrict their own access to campaign contributions during a legislative session through similar narrowly tailored regulations. There surely are many other ways that, alone or in combination, would be far less restrictive of free speech and associational rights than the statute in issue today.
Similarly, even if we accept the proposition that "focusing" legislators' attention on legislative affairs is a compelling interest, we believe it self-evident that less restrictive means exist to achieve this goal. The leadership of both houses of the legislature wield an impressive arsenal of punitive measures that can be imposed upon inattentive legislators. Moreover, the political process itself will tend to punish a legislator who fails to adequately represent the concerns of constituents during a legislative session.
We recognize the state's heavy reliance upon the opinion in Buckley. However, we find the facts of Buckley readily distinguishable. The Court in Buckley confronted, not a complete prohibition on soliciting or accepting contributions, but a ceiling on the amounts that candidates could spend and that individuals could contribute. It is true, as the state notes, that Buckley found a less significant free speech interest when contributions were subject to a ceiling, because the "quantity of communication ... does not increase perceptibly with the size of [the] contribution." Buckley, 424 U.S. at 21, 96 S.Ct. at 635. However, the Buckley Court expressly distinguished its own factual situation from restrictions on contributions that effectively would prevent candidates "from amassing the resources necessary for effective advocacy." Id. This is the precise situation we face today. The statute at issue here prohibits all contributions and solicitations during a crucial portion of an election year. As a result, the present case is vastly different from Buckley.
Finally, the state calls to our attention the "crisis of confidence" Florida suffers with respect to its politicians. In support of this proposition, the state cites newspaper editorials labeling the trial court's order a "victory for corruption." This is an opinion with which we must disagree.
While we have every faith in the integrity of Florida's incumbent officeholders, we cannot help but note that the statute at *267 issue today gives these officeholders a significant advantage over nonincumbents. Through this statute, underdog candidates dependent on a steady trickle of small campaign contributions from private individuals may be choked out of electoral campaigns for one-sixth or more of an election year. For the same period of time, grassroots political efforts will be stymied; and private citizens who wish to send small contributions to a newcomer politician will be locked out of the political process.
Meanwhile, incumbent politicians have little to fear  and much to gain  by this arrangement. At best they will simply wait until the money flows again, or wait until a session ends to redeem the favors they may have bestowed. And while their nonincumbent opponents are locked out of a public forum by the Campaign Financing Act, the incumbents enjoy the limelight created by the legislative session itself. Incumbent legislators can obtain headlines merely by calling a press conference about some aspect of their official duties. Nonincumbents, meanwhile, cannot even spend money from their own wallets to buy the gasoline needed to drive to a town meeting to discuss their political views.
These problems stem from the drastic, overbroad curtailment of free speech and associational rights imposed by this statute. We commend the legislature for making an effort to eliminate the problems or perceived problems associated with campaign contributions solicited or accepted by incumbents during a session. However, the Constitution regretfully requires us to strike this statute for its substantial infirmities. Indeed, few rights are more basic to the American tradition than the ability of people to work for political reform through grassroots or personal campaigning. The raising of money from private sources is a crucial component of this right. In its commendable effort to stop the appearance of corruption caused by well-heeled special interests, the Campaign Financing Act imposes too heavy a hand on the innocent.
Accordingly, the Campaign Financing Act is unconstitutional for its overbroad intrusion upon the rights of free speech and association. Amend. I, U.S. Const.; Art. I, §§ 4, 5, Fla. Const. To this extent, the order of the circuit court is affirmed.[3]
It is so ordered.
BARKETT and GRIMES, JJ., concur.
OVERTON, J., concurs with an opinion.
EHRLICH, C.J., concurs in result only with an opinion, in which McDONALD, J., concurs.
McDONALD, J. concurs in result only with an opinion.
SHAW, J., recused.
OVERTON, Justice, concurring.
While I find that the legislature has the authority to broadly restrict contributions to prevent corruption or an appearance of corruption, I fully agree with the majority and conclude that section 106.08(8), Florida Statutes (1989), does not provide the least intrusive means to accomplish this purpose. The total restriction on contributions during the legislative session, coupled with the timing of the regular session, makes this statute unconstitutional. As acknowledged by the state, an individual who decides to run for the legislature or a statewide office in the first week of April would find that he or she could legally do nothing to organize a campaign until the legislature adjourns. To emphasize this point, a prospective candidate would not be able to contribute to himself or herself, open an office, travel, or obtain telephone service or stationery for the campaign. The adjournment of the legislature typically takes place during the first week in June, leaving *268 approximately one month before qualifying and three months before the primary election. As noted in the majority, the practical effect of the statute gives incumbents a decided advantage since they would have access to a public forum while the challengers would be practically shut out from any campaign activity. The statute as drawn is unconstitutional.
I would note that, if more time existed from the date of the adjournment of the session to the primary election, the statute could possibly be narrowly written to pass constitutional muster. In this case, while the statute is not vague, it clearly is overbroad.
EHRLICH, Chief Justice, concurring in result only.
I concur with the result reached by the majority, and agree that because the statute applies to all candidates for statewide or legislative office it is not the least restrictive means of achieving the state's valid compelling interest.
I do not share the majority's concern with the statute's applicability to legislative sessions. Even if we assume that the statute applies to all sessions, I do not see how this affects its facial constitutionality. In judging the facial constitutionality of this statute, we must look at how it is certain to be applied. Only a yearly regular session is mandated; all other legislative sessions must be specially called. The special or extraordinary apportionment sessions can only occur every ten years. Further, these special sessions cannot be called at the whim of any legislator, but require specific action or circumstances to occur. For example, a "special" session can only be called by the governor, article III, section 3(c)(1), Florida Constitution, or by a joint proclamation of the President of the Senate and the Speaker of the House of Representatives, section 11.011, Florida Statutes (1989). The majority states, that "the legislature could be called into a series of sessions lasting for huge portions of any given year," so that there is the potential for the statute's effect to be "so extreme as to be irremediably unconstitutional," maj. op. at 265. However, this concern should properly be addressed in an attack on the statute as applied, should it be utilized in such a manner.
Accordingly, although I cannot completely concur with the majority's analysis, I do concur that the statute is facially unconstitutional.
McDONALD, J., concurs.
McDONALD, Justice, concurring in result.
I agree that section 106.08(8), Florida Statutes (1989) (the Campaign Financing Act), is unconstitutional. I concur with the views expressed by Chief Justice Ehrlich and limit my objection to the fact that the statute applies to nonlegislative candidates and thereby is unnecessarily and improperly overbroad.
NOTES
[1] This statute had been approved by the 1989 Florida Legislature and governor as part of an omnibus revision of state campaign financing law. Ch. 89-256, § 12, Laws of Fla.
[2] The Austin opinion approved severe restrictions on the ability of corporations to make contributions directly from corporate treasuries. Austin v. Michigan Chamber of Commerce, ___ U.S. ___, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). The Court concluded that the corrupting influence caused by enormous concentrations of corporate wealth justified the restriction. Id.
[3] We disagree with that portion of the circuit court order finding the statute vague. Although the terms "solicit" and "special session" are somewhat ambiguous, we believe these terms easily can be construed in light of the legislative intent so as to render them reasonably precise. This sort of judicial refinement of language is permissible where, as here, the statute and its underlying intent suggest a saving construction. See Brown v. State, 358 So.2d 16, 20 (Fla. 1978). We believe it is clear, for instance, that the legislature intended the statute to encompass all legislative sessions, whatever their technical description.