922 F.Supp. 1413 (1996)
SHRINK MISSOURI GOVERNMENT PAC, a political action committee; W. Bevis Schock; and Timothy Dreste, Plaintiffs,
v.
John MAUPIN, in his official capacity, as Chairman of the Missouri Ethics Commission; and Jeremiah W. Nixon, in his official capacity as Attorney General for the State of Missouri, Defendants.
No. 4:96CV8SNL.
United States District Court, E.D. Missouri, Eastern Division.
April 22, 1996.
*1414 Nelson L. Mitten, E.W. Gentry Sayad, James B. Deutsch, Riezman and Blitz, St. Louis, MO, for plaintiffs.
Karen King Mitchell, Cynthia A. Barrett, James R. Layton, Keith J. Grady, Stephen R. Martin, II, Attorney General of Missouri, Assistant Attorney General, Jefferson City, MO, for defendants.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
Plaintiffs have filed this declaratory judgment action regarding Missouri's recently amended Campaign Finance Disclosure Law, § 130.011 et. seq. R.S.Mo. They seek to permanently enjoin, on constitutional grounds, the implementation and enforcement of § 130.032(4) which prohibits statewide elected officials, state senators, state representatives, and candidates for those offices, from accepting campaign contributions during any regular session of the general assembly.[1]
On January 23, 1996 a one-day bench trial was held in this case. Counsel for the parties were present and stipulated to the Court that the proceedings constituted a hearing on the merits regarding a permanent injunction, rather that an abbreviated hearing typical for consideration of a preliminary injunction. Counsel for the parties filed a stipulation in which the defendants' exhibits A-V are true and accurate and are admissible for purposes of the hearing. In addition, the stipulation provided that the affidavits of Tom Dreste *1415 (Plaintiffs' Exhibit 1), Senator Wayne Goode (Defendants' Exhibit W), and Representative May Scheve (Defendants' Exhibit X) could be received in lieu of live testimony in that these witnesses were unavailable. The Court accepted the parties' stipulation and received all of the afore-mentioned exhibits into evidence. The Court further received into evidence Plaintiffs' Exhibits 2 and 3. This constituted all of the exhibits offered and received into evidence. This Court, having now considered the pleadings, the testimony of the witnesses, the affidavits, and the documents in evidence, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

FINDINGS OF FACT
The facts pertinent to this matter are largely undisputed. Plaintiffs Schock and Dreste are political campaign contributors and prospective candidates for statewide-elected public and legislative offices. Shrink Missouri Government PAC (hereinafter referred to as simply Shrink PAC) is a political action committee planning to accept and make campaign contributions in the future to candidates whom Shrink PAC believes will advance the political beliefs upheld by Shrink PAC.
Defendant Maupin is the Chairman of the Missouri Ethics Commission, a state agency charged with the administration and enforcement of the Campaign Finance Disclosure Law. He is named as a representative of the Commission and is being sued in his official capacity only. Defendant Nixon is the duly elected Attorney General for the State of Missouri. He is the chief legal counsel charged with the responsibility for the interpretation and enforcement of the Campaign Finance Disclosure Law. Defendant Nixon is being sued in his official capacity only.
In 1994 the Missouri General Assembly adopted a legislative bill known as Senate Bill 650. The purpose of the bill was to amend Missouri's Campaign Finance Disclosure Law in several respects.[2] Senate Bill 650 amended § 130.032(4) R.S.Mo. by now prohibiting statewide elected officials, state senators, state representatives, and candidates for these offices, from accepting campaign contributions during the regular session of the general assembly. § 130.032(4) (amended) reads as follows:
4. No contribution shall be accepted by a person serving as a statewide elected official or serving as a member of the general assembly, or by a candidate for any statewide elected office or candidate for state senator or state representative, or by a committee acting on behalf of such an individual, during any regular session of the general assembly, except candidates for a special election to fill a vacancy in any such office may accept contributions to be used in conjunction with that special election during a regular session of the general assembly.
Plaintiffs Schock and Dreste are individuals who desire to make future campaign contributions, during the regular session of the general assembly, to candidates for the afore-referenced public offices. They also are prospective candidates for the afore-referenced public offices who desire to solicit and accept contributions during the regular *1416 session of the general assembly.[3] Shrink PAC is a political action committee which desires to solicit, accept, make and receive campaign contributions for use by candidates for the afore-referenced public offices. Plaintiffs contend that § 130.032(4) violates the plaintiffs' First Amendment rights of free speech and association because the limitations imposed are not narrowly tailored to serve any compelling state interest. They further contend that § 130.032(4) violates their equal protection rights under the Fourteenth Amendment because the temporal ban on campaign contributions is not imposed upon similarly situated incumbents or challengers to county or local public offices. Finally, plaintiffs contend that § 130.032(4) violates their due process rights under the Fourteenth Amendment because it is unconstitutionally vague as to what is required to avoid the criminal penalties imposed under the law for acceptance of contributions, during the banned time-period, by a committee acting "on behalf of" an incumbent or challenger.

CONCLUSIONS OF LAW
There are two preliminary matters that must be addressed before the Court can properly address the question of the constitutionality of § 130.032(4). Firstly, there is the matter of the defendants' motion for judgment as a matter of law regarding the plaintiffs' Fourteenth Amendment equal protection claim. At the hearing the plaintiffs did not adduce any evidence in support of this claim. Furthermore, their post-trial brief completely fails to address this claim or to oppose the defendants' motion. The Court surmises that the plaintiffs' have abandoned this claim. Therefore, the Court will grant the defendants' motion for judgment as a matter of law on the merits of the plaintiffs' equal protection Fourteenth Amendment claim. Judgment for the defendants on this claim will be so entered.
Defendants contend that the "strict scrutiny" standard of review should not be applied to § 130.032(4) because statutes limiting campaign contributions only impact upon an individual's right of free association, not free speech. They contend that contribution limits only affect a contributor's right to political association by aligning him or herself with a candidate with similar political views; whereas, expenditure limits have a significant impact on an individual's ability to effectively discuss and debate campaign issues. Defendants further contend that the statute at issue here is even more limited in its impact on core First Amendment activity because unlike contribution limitation statutes which limit the amount of money an individual can contribute to a political candidate or committee, § 130.032(4) only limits the time when an individual can contribute to a political candidate or committee. Defendants aver that the temporal ban is only a short amount of time which serves only to delay the making of the contribution. However, during the temporal ban, the potential contributor is free to support his or her candidate in numerous other ways, and the office-holder or the candidate is free to discuss and debate political issues as desired. Defendants opine that the statute should be reviewed under an intermediate level of scrutiny under which the law must bear a substantial relationship to an important state interest.
Plaintiffs, on the other hand, advance a "strict scrutiny" review of the statute by this Court. Plaintiffs view the statute as a "zero campaign contribution limit" statute which directly impinges upon the core First Amendment rights of free speech and association by stopping receipt of all contributions for a period of time which reduces the ability of candidates to effectively engage in political communication. They believe that such a governmental restriction must be narrowly tailored to serve a compelling state interest.
*1417 It is well-established that the right to free speech (including political speech) and the right to free association (including political association) are fundamental activities protected by the First Amendment. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution ... [t]he First Amendment protects political association as well as political expression." Buckley v. Valeo, 424 U.S. 1, 14-15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1975). A campaign finance law which burdens these "core" First Amendment rights must pass constitutional muster. The pivotal question is under what standard should a reviewing court use to determine whether the burden placed on these rights by a campaign finance law is impermissible.
In Buckley, supra. the Supreme Court distinguished between campaign finance laws which imposed expenditure limitations and campaign laws which imposed contribution limitations. It reasoned that expenditure limits "represent substantial rather than merely theoretical restraints on the quantity and quality of political speech." Buckley, 424 U.S. at 19, 96 S.Ct. at 635. It reached this conclusion based upon its finding that:
"[a] restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensible instruments of effective political speech.[4]
Id., 424 U.S. at 19, 96 S.Ct. at 634-35. (footnotes omitted).
However, the Court found that contribution limits, although clearly also implicating fundamental First Amendment rights, "entails only a marginal restriction upon the contributor's ability to engage in free communication." Buckley, 424 U.S. at 20, 96 S.Ct. at 635. The Court stated:
"[a] contribution serves a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of the contribution, since the expression rests solely on the undifferentiated symbolic act of contributing ... A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contribution may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contribution into political debate involves speech by someone other than the contributor."
Buckley, 424 U.S. at 21, 96 S.Ct. at 635-36.
Since expenditure limits place a greater restraint on core First Amendment rights than do contribution limits, laws imposing expenditure limits are subject to "exacting scrutiny". Buckley, 424 U.S. at 44, 96 S.Ct. at 646-47. In order to determine whether restrictions on campaign expenditures may be constitutionally applied, a reviewing court must first determine whether the law at issue "burdens the exercise of political speech and if it does, whether it is narrowly tailored to serve a compelling interest." Austin v. Michigan Chamber of Commerce, *1418 494 U.S. 652, 657, 110 S.Ct. 1391, 1396, 108 L.Ed.2d 652 (1986) citing Buckley v. Valeo, 424 U.S. at 44-45, 96 S.Ct. at 646-47. The lesser imposition on core First Amendment rights by contribution limits necessitates a "less compelling justification" in order to pass constitutional review. See, Federal Election Comm'n v. Massachusetts Citizens for Life, 479 U.S. 238, 259-60, 107 S.Ct. 616, 629, 93 L.Ed.2d 539 (1986).
The distinctions first articulated by the Supreme Court in Buckley, supra. were recognized by the Eighth Circuit Court of Appeals in Carver v. Nixon, 72 F.3d. 633 (8th Cir.1995). The issue before the Court was whether the contribution limits set forth in Proposition A[5] unconstitutionally restricted the plaintiff's First Amendment rights to political expression and political association. Carver, at 636. The Court considered the detailed analysis of the Supreme Court regarding the degree of restraint imposed by expenditure limits as opposed to contribution limits. It also considered the Court's decisions on campaign finance laws subsequent to Buckley. Carver, at 637. It found that "[t]he Court has not ruled that anything other than strict scrutiny applies in cases involving contribution limits." Carver, at 637. It appears that the Eighth Circuit equates the Supreme Court's rulings that contribution limits are subject to "the closest scrutiny", Buckley, 424 U.S. at 25, 96 S.Ct. at 637-38, in that any law imposing contribution restraints "may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms.", Buckley, 424 U.S. at 25, 96 S.Ct. at 637-38, with the "exacting scrutiny" expressed by the Buckley Court and the Austin Court regarding expenditure limitations.[6]
The limitation at issue in this lawsuit is not the typical contribution limit; i.e. a monetary limit. Instead it is a limitation on when a contribution can be made. As a temporal ban on contributions (regardless of the amount of the contribution), the statute effectively eliminates a candidate's contributions intake[7] for four and one-half (4½) months. Such a shutdown of funding will directly affect a candidate's expenditure of funds during this period also. The Florida Supreme Court had the occasion to review a campaign finance disclosure law very similar to the one presently before this Court. In State of Florida v. Dodd, 561 So.2d 263 (Fla.1990), the plaintiff, a candidate for party nomination for the Commissioner of Agriculture (a statewide-elected office) filed a declaratory action seeking to enjoin enforcement of Florida's Campaign Financing Act because it violated his free speech and association rights. The Act provides:
A candidate who is running for legislative office or a statewide office, except a candidate for a vacant office being filled by special election, may not accept or solicit any campaign contribution during a regular or special session of the Legislature.
§ 106.08(8) Fla.Stat. (1989). The Florida Supreme Court recognized that any restriction upon political contributions implicated not only the First Amendment right to free speech, but also the First Amendment Right to free association. The Court viewed the statute as "particularly grave" because the "Campaign Financing Act does in fact have the effect of cutting off all sources of campaign financing for any period of time in *1419 which the legislature is in regular or special session." Dodd, at 264. It noted that in Buckley, supra., the U.S. Supreme Court stated:
[Given the important role of contributions in financing political campaigns] contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates from amassing the resources necessary for effective advocacy.
Dodd, at 264 quoting Buckley, 424 U.S. at 21, 96 S.Ct. at 636. The Florida Supreme Court found that the governmental intrusion represented by Florida's Campaign Financing Act involved "weighty free speech and associational rights" protected by federal and state constitutional law. Dodd, at 264. Consequently, it opined that the "strict scrutiny" test articulated in Austin, supra. was applicable. Dodd, at 264.
Although the Florida campaign finance law was more restrictive than § 130.032(4) in that it prohibited solicitation of contributions (as well as acceptance of contributions) and included special sessions (as well as regular sessions) as the banned time-period, the reasoning of the Florida Supreme Court is persuasive. Missouri's campaign finance law bans acceptance of contributions for four and one-half months during the current election year. There is no reason to believe that this banned time-period won't remain the same every year. Four and one-half months is over one-third of every year in which a candidate is completely cut off from generating immediate funds for running his or her campaign. This Court believes that the restriction imposed by § 130.032(4) not only implicates the plaintiffs' right of free association, but also directly implicates the plaintiffs' right of free speech because this limitation would prevent candidates and political committees "from amassing the resources necessary for effective advocacy". Buckley, 424 U.S. at 21, 96 S.Ct. at 636. Schock, Dreste, and Bearden, as individuals who have run for statewide office in the past as non-incumbents and desire to run in the future as new challengers to statewide offices, testified[8] to the difficulties they had attempting to raise money, outside of the legislative session, for their previous campaigns. They testified that the populace is less likely to contribute during a non-election year, preferring to wait until a candidate announces his or her candidacy.[9] They pointed out that non-incumbents are particularly burdened by the four and one-half months ban because they are usually subject to primary elections, which for the most part are held only three (3) months after the regular legislative session ends. Consequently, contributions accepted after the legislative session ends must be used not only to advance an non-incumbent's campaign for the primary election, but also for the general election (which is held six months after the regular legislative session ends). Although candidates for statewide office, both incumbents and non-incumbents, are capable of raising funds in the months prior to the regular session of the Missouri legislature, even the defendants' own evidence shows that incumbents consistently amass more funds outside of the legislative session. Defendants' Exhibits M through S. Defendants' Exhibit L, clearly shows that incumbents routinely raised more funds for the six months prior to the current legislative session, than the non-incumbent challengers. For example, in the Governor's race, the defendants point to challengers Margaret Kelly and John Hancock as being able to amass a large quantity of funds prior to the current legislative session. However, Ms. Kelly and Mr. Hancock while they are not gubernatorial incumbents, are presently incumbents in other statewide public offices. Their name recognition due to their present offices is not disputed. Even though there was evidence that contributions pick up towards the end of a campaign and expenditures for mass media exposure increase, no one challenged the fact that a four and onehalf months gap in receipt of contributions is loss money that cannot be recouped.
This Court finds that the ban on accepting contributions during the regular session of *1420 the Missouri Legislature constitutes a severe impact not only on political association but also on political communication because it prevents candidates, especially non-incumbent challengers, from "amassing the resources necessary for effective advocacy." Consequently, this Court determines that the temporal restriction placed on political contributions by § 130.032(4) must be narrowly tailored to serve a compelling state interest. See, Austin, 494 U.S. at 657, 110 S.Ct. at 1396; Shrink Missouri Government PAC v. Maupin, 71 F.3d at 1424; but see, Zeller v. The Florida Bar, 909 F.Supp. 1518, 1524-1525 (N.D.Fla.1995).
In its two recent opinions addressing the constitutionality of Proposition A and other provisions of Missouri's campaign finance law, the Eighth Circuit Court of Appeals espoused the general rule that when determining whether a campaign finance law impermissibly infringes upon First Amendment rights, a reviewing court's task is to first decide if the law in question actually burdens the exercise of free speech, and then if it does, to determine whether the law is narrowly tailored to serve a compelling state interest. Carver v. Nixon, at 638; Shrink Missouri Government PAC v. Maupin, at 1424; see also, Austin, 494 U.S. at 657, 110 S.Ct. at 1396; Federal Election Commission v. Massachusetts Citizens for Life, 479 U.S. at 252, 107 S.Ct. at 624-25. It is the State's burden to prove to the Court that the purpose of § 130.032(4) is to protect a compelling state interest and that it was specifically fashioned to advance this interest.
As previously stated, § 130.032(4) effectively shuts down funding of political campaigns for four and one-half months while the Missouri Legislature is in its annual regular session. This ban on acceptance of contributions seriously impacts the expenditure of funds for political expression since money is not generated for the "communicating of ideas in today's mass society". Buckley, 424 U.S. at 19, 96 S.Ct. at 635. Section 130.032(4) burdens the exercise of free speech.
The question then becomes whether the statute embodies a compelling state interest. The State proffers three "compelling state interests" governed by § 130.032(4): 1) providing a "level playing field" for all candidates and contributors; 2) preventing financial quid pro quo corruption[10]; and 3) preventing the appearance of corruption. The State's governmental interest in providing a "level playing field" was clearly rejected as a "compelling state interest" by the Buckley Court. Buckley, 424 U.S. at 48-49, 96 S.Ct. at 648-49; see, Shrink Missouri Government PAC v. Maupin, at 1426.
However, the prevention of corruption or the appearance of corruption are recognized "legitimate and compelling government interests" for restricting campaign finances. Austin, 494 U.S. at 658, 110 S.Ct. at 1397; Federal Election Comm'n v. National Conservative Political Action Committee, 470 U.S. 480, 496-97, 105 S.Ct. 1459, 1468-69, 84 L.Ed.2d 455 (1985); Shrink Missouri Government PAC v. Maupin, 71 F.3d at 1426. The State's witness Ms. Connie Rademan and its expert witness Robert Stern both testified that although not every contribution given to an incumbent candidate is intended for a corrupting quid pro quo arrangement, acceptance of contributions while the legislature is in regular session promotes the appearance of corruption. The acceptance of contributions at that time undermines the public's confidence in their elected officials. Thus, the Court finds that § 130.032(4) can be construed as embodying a compelling state interest.
While the State's interest in stopping corruption or the appearance of corruption constitutes a compelling state interest, it has failed to meet its burden of advancing this interest through the least intrusive means.
Defendants wholly failed to adduce any evidence of actual corruption taking place due to acceptance by incumbents or non-incumbents accepting contributions during the Legislature's regular session. The harm that the defendants seek to eradicate must exist and its "cure" must specifically be directed toward the elimination of that harm.

*1421 "When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply `posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."
United States v. National Treasury Employees Union, ___ U.S. ___, ___, 115 S.Ct. 1003, 1017, 130 L.Ed.2d 964 (1995) quoting Turner Broadcasting System, Inc. v. F.C.C., ___ U.S. ___, ___, 114 S.Ct. 2445, 2470, 129 L.Ed.2d 497 (1994) (Kennedy, J., plurality); Carver, at 638. The defendants fail to point to one incident wherein a statewide elected official, a member of the general assembly, a candidate for statewide office or legislative office, or a committee "acting on behalf of such an individual" has cast a vote or agreed to influence a vote, during the general assembly's regular session, in exchange for a contribution. As for the appearance of corruption, the defendants' two witnesses testified in general terms of their belief that the public perceives the acceptance of contributions during the legislative session as "inappropriate". No factual basis was given for these witnesses' perception that the electorate believes that contributions accepted during the general assembly's regular session reflect corruptive deal-making. Affiants Goode and Scheve are Missouri legislators of several years standing. Although they express their personal opinions that the acceptance of contributions during the general assembly's regular session leads to the appearance of corruption, they fail to provide any factual basis for their opinions. They cite no examples or incidents of actual corruption linked to such contributions nor incidents wherein "innocent" contributions were perceived by the public as being given and accepted for a corruptive intent. They fail to relate any incidents wherein their constituents voiced displeasure to them regarding the acceptance of contributions during the general assembly's regular session. Finally, their opinions focus entirely on the issue of incumbents accepting contributions, not others such as new challengers for a statewide public official position or legislative seat. In further support of the defendants' argument that § 130.032(4) is necessary in order to prevent the appearance of corruption, defendants submit newspaper articles regarding political contributions. The Court has carefully reviewed these articles and finds that they fail to demonstrate a pervasive problem with contributions during the legislative session and the public's negative viewpoint of such contributions. Defendants' Exhibit H is a newspaper article about Southwestern Bell's philosophy regarding campaign finances. As one might expect, it contributes to the campaigns of politicians who support bills favorable to Southwestern Bell and reduces or stops contributing to the campaigns of politicians who don't support these favorable bills. This is a basic underlying justification for the fundamental exercise of the First Amendment right of political association. "Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals". Buckley, 424 U.S. at 22, 96 S.Ct. at 636. The article does not indicate when the contributions are made nor does it suggest a problem of corporate contributions during the legislative session. Although corporate contributions can be regulated in order to prevent actual corruption or the appearance of corruption, such regulations have been constitutionally restricted to the size of the contribution, not the timing of the contribution. Buckley, 424 U.S. at 26-29, 96 S.Ct. at 638-40. Defendants' Exhibit I is a newspaper article regarding the conviction of a corporate official for forging documents he sent to the Missouri Department of Health. As a side note, the article refers to an incident occurring four (4) years earlier in which this same man sent campaign contributions to members of a legislative committee considering a bill affecting the corporate official's company. The contributions were rejected by the legislators. The article does not state whether the Legislature was in session at the time, or whether the members of the House committee considering the bill were reviewing it prior to commencement of the regular session. An incident in 1988 wherein *1422 one corporate official sent $300.00 in campaign contributions to seven of the ten members of a House committee considering a bill favorable to the corporate official's company[11] hardly lends strong support for amending Missouri's campaign finance law six years later to prohibit all contributions to statewide elected public officials, members of the general assembly, candidates for these positions, and committees "acting on behalf" of such persons for over four months every year. Finally, Defendants' Exhibit J purports to be a collection of newspaper articles about campaign contributions by gambling interests to public officials and state legislators in Louisiana. Although the Court can appreciate the concerns which the State of Louisiana may have with campaign contributions and actual corruption or the appearance of corruption, it is not for this Court to adjudge the constitutionality of Missouri's campaign finance laws on the basis of the failings of Louisiana's legislature. There has been no evidence adduced before this Court that Missouri legislators have been enticed to improperly carry out their legislative duties by gambling interests in Missouri. It is this Court's considered opinion that the defendants have wholly failed to establish a constitutional nexus between the interest they seek to further, i.e. actual corruption or the appearance of corruption, and the vast prohibition on acceptance of contributions during the general assembly's regular session.
Even if the defendants had established some connection between actual corruption or the appearance of corruption and § 130.032(4), the Court finds that the prohibition contained in § 130.032(4) is not narrowly tailored to serve this interest.
The prohibition contained in § 130.032(4) applies to all officeseekers, incumbents and non-incumbents alike. If its purpose is to curtail corruption or the appearance of corruption by eliminating financial quid pro quo contributions, the Court is hard-pressed to understand how this goal can be accomplished by applying the prohibition to non-incumbent candidates or even some public officials who are not subject to such a corrupting arrangement. For example, plaintiffs Schock and Dreste presently are not in public office or in a position to cast a legislative vote in exchange for campaign contributions. What possible corrupting influence or arrangement can be prevented by prohibiting campaign contributions to persons with no power to interfere with the integrity of the legislative process?
Furthermore, § 130.032(4) fails to recognize the reality that corruption can take place anytime, even outside the banned time-period. If corrupt practices can take place during the regular session, they can just as easily take place other times during the year. Defendants concede that the statute does not prohibit the solicitation of contributions during the legislative session. "A quid pro quo arrangement, if one existed, might very well take the form of an under-the-table or tacit I.O.U. to be redeemed after the session ends." Dodd, at 266. Defendants fail to consider that "dangling a carrot" before a legislator is more apt to produce the desired effect than paying up front and hoping s/he carries out the contributor's wishes.
Finally, the Court notes that the statute on its face fails to exempt application of the prohibition for contributions by candidates to their own campaigns during the general assembly's regular session. Preventing corruption or the appearance of corruption is hardly a worthy endeavor to pursue by prohibiting candidates from utilizing their own money in their campaigns. The problem of improper influence by outside interests is not implicated when the monies come from the candidate him or herself. In this respect the statute is undeniably unconstitutional as evidenced by the Buckley Court's ruling that struck down portions of a campaign finance statute because it prohibited candidates from contributing their own monies to their campaign. Buckley, 424 U.S. at 52-53, 96 S.Ct. at 651.
After reviewing the record adduced at the hearing and the exhibits submitted for the Court's review, it is evident to the Court that § 130.032(4) was approved by the Missouri Legislature with little debate or discussion as *1423 to its implications and impact. Defendants have submitted documents from the record of the Joint Committee on Campaign Finance Reform, which was an interim legislative committee considering proposals for the 1994 legislative session. Defendants' Exhibit D is a transcript of the public hearing before the Committee. This transcript clearly shows that little attention was given to the issue of prohibiting contributions during the legislative session or to the prevention of corruption or the appearance of corruption. Two public officials spoke before the Committee about the need for campaign finance reform, Judy Moriarty  (former) Secretary of State and defendant John Maupin. Neither one uttered a word about the need to prevent actual corruption or appearance of corruption and the remedy being an in-session ban on campaign contributions. The issue wasn't raised until members of the group Missourians for Fair Elections spoke to the Committee.[12] Only one member of the group referred to the issue of an in-session ban on campaign contributions. He only referred to it in the context that Iowa had a similar ban. No explanation for the proposal was given. No factual basis for the proposal was given. In fact, there was no discussion of the proposal as being linked to actual corruption or the appearance of corruption. Defendants' Exhibit D, pg. 42. The only other reference in the hearings' transcript is on page 55 of Exhibit D wherein Representative Scheve simply states that several states have not upheld statutes which impose an in-session ban on campaign contributions. Following this statement by Representative Scheve, Missourians for Fair Elections member Roy Blount simply stated his "legal opinion" that since the proposed ban (which was not detailed) would be similar to the ban imposed in Iowa,[13] he believed it would be upheld by the courts. Defendants' Exhibit D, pg. 57. There is nothing further in the transcript regarding an in-session ban on campaign contributions. No questions were raised about what the proposal would encompass, no discussion about who would be covered by the in-session ban, and no discussion or debate about the merits of such a ban. Most importantly, there is no record of any discussion or debate about a prevailing problem with actual corruption or the appearance of corruption necessitating such a ban.
Defendants' Exhibit E is a document purporting to be a statement by the League of Women Voters offered to the Committee on October 13, 1993. The statement identifies issues urged for consideration by the Committee. It makes reference to contribution limits as a needed campaign finance reform, but the reference is in the context of amount of the contributions, not the timing of the contributions.
Defendants' Exhibit F is a document purporting to be the Committee's meeting agenda of October 13, 1993. No discussion or debate about an in-session ban on campaign contributions is noted. The only mention of the ban is a one-sentence reference that sixteen (16) states have adopted in-session bans on lobbyists making contributions.
Given this sparse legislative record, the Court is left with the distinct impression that § 130.032(4) was drafted and considered only with a modest substantive analysis. There is nothing before this Court which demonstrates that any evidence was presented to the Joint Committee on Campaign Finance Reform regarding actual corruption or the appearance of corruption and the eradication of this harm by an in-session ban on campaign contributions. There is no indication that any discussion or debate was generated regarding the distinction between incumbent legislators and non-incumbents as to possible financial quid pro quo corruptive arrangements. There is nothing before this Court that demonstrates that any attempt was made to access and analyze the public's views on acceptance of contributions during the general assembly's regular session. What is before the Court is Defendants' Exhibit G *1424 which shows that § 130.032(4) is much more broad in its in-session ban than most, if not all, other states that have passed in-session contribution prohibitions.
The Court concludes that § 130.032(4) effectively prohibits all contributions to all persons presently holding a statewide-elected political office or legislative office, and all candidates for these offices, for a significant period of time. This prohibition on all campaign contributions while the Missouri Legislature is in session amounts to an imposition of an aggregate limit on total contributions incumbents and candidates receive during the banned time-period, in essence, a zero contribution limit. Such a contribution limit severely impacts on a candidate's ability to expend funds which in turn impinges upon the rights of individual citizens and candidates to engage in political debate and discussion. See, Buckley, 424 U.S. at 23-38, 96 S.Ct. at 636-44. The defendants have failed to carry their burden of demonstrating that § 130.032(4) will alleviate actual corruption or the appearance of corruption in a direct and material way; nor have the defendants demonstrated that § 130.032(4) is narrowly tailored to further the State's compelling interests. Accordingly, the Court concludes that 130.032(4) unconstitutionally burdens the First Amendment rights of expression and association.
The Court further finds that the statute at issue is unconstitutionally vague and violates the plaintiffs' rights to due process under the Fourteenth Amendment. Section 130.032(4) prohibits "a committee acting on behalf of" any statewide-elected public official or legislative incumbent, or a candidate for statewide public office or legislative office, from accepting campaign contributions. Plaintiffs presented evidence that they and others believe that the statute's prohibition is applicable to Shrink PAC because it solicits and accepts contributions, and in turn, contributes this money to candidates who share its philosophy and ideals. Mr. Schock testified that because he believed that the statute was applicable to Shrink PAC, Shrink PAC could not identify the names of candidates it intends to support to potential contributors.[14] Plaintiffs' witness Dr. George Schedinger testified that he would not contribute to Shrink PAC unless he knew the names of the candidates which it intended to support. Although he understood that contributions could be solicited during the regular session and held for distribution until the session ends, he still believed that this was an impermissible infringement of his right to free speech and free association.
Defendants' expert witness Robert Stern testified that in his opinion the "on behalf of" language limits application of § 130.032(4) to a committee controlled by a candidate. He distinguished a committee controlled by a candidate as one formed by a candidate and authorized by the candidate to accept and expend contributions as dictated by the candidate, from an independent committee such as political action committees which normally are formed by citizens to address a variety of issues or to solicit and contribute funds to the campaigns of any number of candidates who share the PAC's viewpoints. Defendants further argue that "committee" by definition includes campaign committee, candidate committee, continuing committee, and political party committee. They point out that only "candidate committee" uses the "on behalf of' language as it is used in § 130.032(4). Consequently, defendants contend that § 130.032(4) was designed to apply only to candidate committees and to prohibit those committees from accepting contributions during the regular session of the general assembly. Finally, they contend that no evidence has been adduced at the hearing that any effort has been made to enforce § 130.032(4) to PACs such as Shrink PAC.
Where legislation imposes criminal penalties in an area implicating First Amendment rights, close examination of the specificity of the statutory limitation is required. Buckley, 424 U.S. at 41, n. 48, 96 S.Ct. at 645, n. 48. Precision of language is the required standard. Id., 424 U.S. at 41, 96 S.Ct. at 645.
"Due process requires that a criminal statute provide adequate notice to a person *1425 of ordinary intelligence that his contemplated conduct is illegal, for `no man shall be criminally responsible for conduct which he could not reasonably understand to be proscribed'. Where First Amendment rights are involved, an even `greater degree of specificity' is required."
Id., 424 U.S. at 77, 96 S.Ct. at 662 (citations omitted).
The Court agrees with the plaintiffs that Mr. Stern reads into the statute the word "controlled" and then leaps to the conclusion that the statute was intended to apply only to "candidate committees". The flaw in this analysis is that the word "controlled" is nowhere to be found in the statute. The statute on its face refers only to "committee". The Missouri Legislature has defined "committee" as follows:
(7) "Committee", a person or any combination of persons, who accepts contributions or makes expenditures for the primary or incidental purpose of influencing or attempting to influence the action of voters for or against the nomination or election to public office of one or more candidates ...
. . . . .
(b) The term "committee" includes, but is not limited to, each of the following committees: campaign committee, candidate committee, continuing committee, and political committee.
Section 130.011(7). Definitions are provided for each of the above enumerated committees. Section 130.011(9) defines "continuing committee" and it is clear that Shrink PAC falls within the definition of a continuing committee.
The only defined term that the statute uses is the defined term "committee". Pursuant to the definition of "committee", Shrink PAC would be subject to the provisions of § 130.032(4). Since the phrase "on behalf of" is left undefined by the legislature, the "constitutional requirement of definiteness" is not met, thereby rendering the statute unconstitutionally vague. See, Buckley, 424 U.S. at 77, 96 S.Ct. at 662-63.[15]
In summary, the Court finds that § 130.032(4) unconstitutionally violates the plaintiffs' First Amendment rights to free speech and association because it is not narrowly tailored to serve a compelling state interest. Furthermore, it violates the plaintiff's due process rights under the Fourteenth Amendment because it is unconstitutionally vague as to its application to political action committees such as Shrink PAC.

ORDER
In accordance with the memorandum filed herein this day,
IT IS HEREBY ORDERED that the plaintiffs' request for a preliminary and permanent injunction be and is GRANTED. Judgment entered for the plaintiffs and against the defendants on the merits of the plaintiffs' claims for violation of their First Amendment rights of free speech and free association, and their due process rights under the Fourteenth Amendment.
IT IS FURTHER ORDERED that defendants' motion for judgment as a matter of law regarding the plaintiffs' Fourteenth Amendment equal protection claim be and is GRANTED.
IT IS FINALLY ORDERED that this cause of action is hereby DISMISSED with no further action to be taken.
NOTES
[1] The statute at issue has an exception to this prohibition for candidates for a special election to fill a vacancy. This exception is not at issue in the instant case.
[2] Two other provisions of Senate Bill 650, adopting campaign contribution limits, was set to become effective January 1, 1995. However, in November 1994, the citizens of Missouri approved Proposition A (a ballot initiative setting lower contribution limits). The contribution limits set forth in Proposition A became effective immediately. Shortly thereafter, individual campaign contributors and Shrink PAC filed two lawsuits challenging the constitutionality of the Proposition A contribution limits, as well as the expenditure limits set forth in the amended Campaign Finance Disclosure Law. The Eighth Circuit Court of Appeals has recently ruled in these two cases, Carver v. Nixon, 72 F.3d 633 (8th Cir.1995) and Shrink Missouri Government PAC v. Maupin, 71 F.3d. 1422 (8th Cir.1995), holding that the amendments to Missouri's Campaign Finance Disclosure Law (by virtue of either Senate Bill 650 or Proposition A) regarding contribution and expenditure limits were in violation of the First Amendment. Attorney General Nixon has filed a petition for writ of certiorari in the Carver case with the United States Supreme Court. The Court is also aware of the recent arguments heard by the United States Supreme Court in a case challenging federal limits on campaign spending.
[3] The 1996 regular session of the general assembly commenced on January 3, 1996 and is scheduled to end on May 17, 1996. Unfortunately, due to other pressing matters, the Court was not able to address this matter until now. Consequently, the Court's ultimate decision will have minimal impact regarding the current regular session of the general assembly; however, resolution of this matter is not directed solely to the current session of the general assembly but to all future regular sessions.
[4] What was true in 1975 is even more true today. Political expression is no longer limited to the traditional forms of mass media but now may be disseminated by a single keystroke. It is now common for politicians (incumbents and challengers alike) to have their own website on the Internet in order to communicate with the electorate.
[5] The contribution limits set forth in Proposition A are limits "per election cycle per candidate". Section 130.100 R.S.Mo. The statute provides that no person or committee shall make a contribution to any one candidate or candidate committee with an aggregate value in excess of (a) $100 for candidates in districts with fewer than 100,000 residents; (b) $200 for other than statewide candidates in districts of 100,000 or more residents; and (c) $300 for statewide candidates (such as the Governor, Lt. Governor, Attorney General, Auditor, Treasurer, and Secretary of State). Section 130.100 R.S.Mo.; see Carver v. Nixon, at 634-35 n. 1.
[6] In Shrink Missouri Government PAC v. Maupin, 71 F.3d. 1422 (8th Cir.1995) the companion case to Carver, the Eighth Circuit also applied a "strict scrutiny" review to another portion of Proposition A which set forth certain contribution limits.
[7] The receipt of contributions before the ban for use during the regular session or use of an incumbent's "war chest" from a previous campaign is not prohibited during this time-period.
[8] Dreste's "testimony" was by affidavit.
[9] The time for a candidate to formally file for a public office is in February of an election year, which falls early during the period of the ban on receipt of contributions.
[10] The concept of a "financial quid pro quo corruption" relates to the concern that legislators and statewide public officials' votes and/or influence could be "bought" when bills are pending.
[11] The article indicates that the legislators returned the contributions.
[12] It appears the Missourians for Fair Elections was the citizens group that drafted the Proposition A ballot initiative which was approved by voters in November 1994.
[13] The Court has not been made aware of the existence of any Iowa statute which presently imposes an in-session ban on campaign contributions similar to the one imposed by § 130.032(4). The defendants did not offer into evidence a copy of the Iowa statute referred to in Exhibit D.
[14] Mr. Schock was allowed to testify not only on his own behalf but also on behalf of plaintiff Shrink PAC. He created Shrink PAC and is its only corporate officer.
[15] The Court notes that Proposition A, Missouri Statute § 130.100, adopted by initiative, does use the defined term "candidate committee" when imposing contribution limits. It would appear that if § 130.032(4) was intended to apply only to "candidate committees" as testified to by defendants' expert Mr. Stern, then the Missouri Legislature could have used that term as it was used in § 130.100.