**ARKANSAS RIGHT TO LIFE STATE POLITICAL ACTION COMMITTEE and David Sloan, Plaintiffs,**

v.

**Brad BUTLER, in his Official Capacity as State Attorney for Benton County, et al., Defendants.**

No. 97–5064.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Dec. 8, 1998.

Michael David Holland, Jr., David G. Nixon, The Nixon Law Firm, Fayetteville, AR, James Bopp, Jr., Robert Newmeyer, Bopp, Coleson & Bostrom, Terre Haute, IN, for Plaintiff.

Shirley E. Guntharp, Brian Brooks, Attorney General's Office, Little Rock, AR, Scott C. Trotter, Trotter Law Firm, Little Rock, AR, Nancy Northup, Kenneth N. Weine, Burt Neuborne, E. Joshua Rosenkranz, Glen Moramarco, The Brennan Center for Justice, New York City, Steve Bach, Attorney at Law, Grainger, IN, for all Intervenor Defendants.

### MEMORANDUM OPINION

H. FRANKLIN WATERS, Senior District Judge.

Currently before the court is plaintiffs' renewed motion for summary judgment and defendants' response thereto. For the reasons set forth below, plaintiffs' motion will be granted.

### I. BACKGROUND

Much of the background of this case, as well as the legal analysis that follows, has been set out by the court in its previous decisions. Thus, we draw liberally from those opinions.

Plaintiffs commenced this lawsuit to challenge the constitutionality of certain provi-

sions of Initiated Act I of 1996, popularly known as the "Campaign Contribution Limits and Disclosure Act" (the "Act"), which amended Arkansas' campaign finance laws. Plaintiffs claim that certain sections of the Act impinge on their First Amendment rights to free speech and association and their Fourteenth Amendment right to equal protection.

Initially, plaintiffs challenged the following sections of the Arkansas Code: (1) § 7–6–203(a) and (b), the $100 and $300 limits on the amount individuals can contribute to candidates for certain state and local offices; (2) § 7–6–201(9)(B), the $200 limit[1] on contributions that individuals can make to approved political action committees ("PACs"); (3) § 7–6–203(d), the section that allows small-donor PACs to contribute as much as $2,500 to candidates for certain state and local offices; (4) § 7–6–203(k), the $500 limit on annual contributions to independent expenditure committees; (5) § 7–6–224, the section that grants authority to local jurisdictions to set lower contribution limits; (6) § 7–6–221(a), the disclosure requirement for persons making independent expenditures; (7) § 7–6–222, the $50 tax credit; and (8) § 7–6–203(g), the 30 day black-out period.[2]

This action was filed on April 30, 1997; however, another action was previously filed challenging the constitutionality of certain provisions of the Act. On February 3, 1997, the case of *Russell v. Burris*, 978 F.Supp. 1211 (E.D.Ark.1997),was filed in the United States District Court for the Eastern District of Arkansas, Western Division. The plaintiffs in *Russell* challenged the following provisions of the Act: (1) the $100 and $300 limits; (2) the $200 limit; (3) the section that allows small-donor PACs to contribute as much as $2,500 to candidates for certain state and local offices; (4) the $500 limit; and (5) the section that grants authority to local jurisdictions to set lower contribution limits.

The Honorable Wm. R. Wilson, Jr., held, after several days of trial testimony, in a memorandum opinion dated October 3, 1997, that: (1) the $100 dollar contribution limit on the amount individuals can contribute to cer-

tain candidates was constitutional, except as it applied to the offices of Supreme Court Justice and Court of Appeals Judge; (2) the $300 dollar limit on the amount individuals can contribute to enumerated statewide offices was unconstitutional; (3) the $100 and $300 limits on the amount that approved PACs may donate to candidates for state and local offices, as opposed to the $2,500 limit on the amount small-donor PACs may donate to candidates, was constitutional and did not violate the Equal Protection Clause of the Fourteenth Amendment; (4) the $200 limit was constitutional; (5) plaintiffs lacked standing to challenge the constitutionality of the $500 limit; and (6) plaintiffs' claim that the authority granted to local jurisdictions to set lower contribution limits was not ripe. *See Russell v. Burris*, 978 F.Supp. 1211 (E.D.Ark.1997). That decision was appealed to the United States Court of Appeals for the Eighth Circuit.

Prior to the Eighth Circuit's ruling in *Russell*, however, this court also ruled on the constitutionality of certain provisions of the Act. Specifically, we held in a memorandum opinion filed November 18, 1997, that the $300 contribution limit, as it applied to the Office of Governor, was unconstitutional; however, we concluded that a genuine issue of material fact existed with respect to the remainder of plaintiffs' constitutional challenges. We also held that plaintiffs' claim that Arkansas Code § 7–6–224, authorizing localities to set reasonable limitations, was not ripe. *See Arkansas Right to Life State Political Action Committee v. Butler*, 983 F.Supp. 1209 (W.D.Ark.1997).

On December 22, 1997, we granted defendants' motion to stay the proceedings as to those issues that had been decided by the district court in *Russell* and were on appeal to the Eighth Circuit. We denied the motion to stay as to those issues that would not be decided by the Eighth Circuit.

On April 17, 1998, however, we stayed the entire proceedings. Defendants had appealed this court's ruling on the issue of plaintiffs' standing. Thus, because the Eighth

---

1. The $200 limit predates the Act.

2. The black-out period predates the Act.

Circuit's ruling on the issue of standing could have been dispositive of all of plaintiffs' claims, we stayed the proceedings in their entirety pending the Eighth Circuit's ruling in this case and in *Russell.*

The Eighth Circuit subsequently affirmed this court in a memorandum opinion filed June 4, 1998, and held that plaintiffs had standing to challenge the provisions of Act I. *Arkansas Right to Life State Political Action Committee v. Butler,* 146 F.3d 558 (8th Cir.1998). In addition, the Eighth Circuit affirmed in part and reversed in part the district's decision in *Russell. See Russell v.. Burris,* 146 F.3d 563 (8th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 510, —— L.Ed.2d —— (1998).

The Eighth Circuit held that the statutes containing the $100 limit, the $300 limit, the $200 limit and the $2,500 limit were unconstitutional. The Eighth Circuit did not rule on the constitutionality of the $500 limit, the disclosure requirement for persons making independent expenditures, or the 30 day blackout period, as those issues were not before the court in *Russell.*

Plaintiffs moved for reconsideration of their motion for summary judgment on June 15, 1998, in light of the Eighth Circuit's ruling in *Russell.* We held in a memorandum opinion dated July 20, 1998, that plaintiffs were entitled to summary judgment, under the doctrine of collateral estoppel, on the issues that had been determined by the court in *Russell.* Namely, we held that the following sections of the Arkansas Code were unconstitutional: § 7–6–203(a) and (b), the $100 and $300 limits on the amount individuals can contribute to candidates for certain state and local offices; § 7–6–201(9)(B), the $200 limit on contributions that individuals can make to approved political action committees ("PACs"); and § 7–6–203(d), the section that allows small-donor PACs to contribute as much as $2,500 to candidates for certain state and local offices.

Plaintiffs moved to voluntarily dismiss Count IV of the complaint which challenged the constitutionality of § 7–6–222, which entitles an individual, a PAC, or organized political party to a $50 tax credit for campaign contributions to candidates. There were no objections to the motion to dismiss, and, thus, we granted plaintiffs' motion to dismiss Count IV of the complaint.

We further held that the remaining claims in this case did not pose a threat to intervenors. Therefore, we concluded that intervenors no longer had standing to defend this lawsuit, and they were dismissed from the lawsuit.

Currently before the court is plaintiffs' renewed motion for summary judgment on the issues that are still ripe, *i.e.,* the issues that were not decided by the Eighth Circuit in *Russell.* Plaintiffs contend that the Eighth Circuit's rulings in *Russell,* and other recent court decisions in similar cases, undermine the constitutionality of the remaining sections of the Act such that this court's earlier ruling denying their summary judgment motion deserves reconsideration. We will address each of plaintiffs' constitutional challenges in turn.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds. *Holloway v. Lockhart,* 813 F.2d 874 (8th Cir.1987); Fed.R.Civ.P. 56(c). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied.

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987); *Niagara of Wisconsin Paper Corp. v. Paper Industry Union—Management Pension Fund,* 800 F.2d 742, 746 (8th Cir.1986).

The Eighth Circuit Court of Appeals has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of

disputed factual issues. *Inland Oil & Transport Co. v. U.S.*, 600 F.2d 725, 727 (8th Cir.1979). Further, in cases premised on alleged violations of a person's constitutional rights, summary judgment may be inappropriate. "As is true with cases involving important public issues, courts may refuse to grant summary judgment in these actions because it is felt that a fuller record is necessary in order to be able to decide properly the issues involved." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2732.2 (3rd ed.1998) (footnotes omitted).

## III. DISCUSSION

### A. The $500 Limit

An "independent expenditure committee" is defined by the Act as "any person who receives contributions from one or more persons in order to make an independent expenditure and is registered pursuant to Arkansas Code 7–6–215 prior to making expenditures." Ark.CodeAnn. § 7–6–201(14) (Supp.1997). An "independent expenditure" is defined as any expenditure which is not a contribution and:

  (A) expressly advocates the election or defeat of a clearly identified candidate for office; and

  (B) is made without arrangement, cooperation, or consultation between any candidate, or any authorized committee or agent of such candidate, and the person making the expenditure or any authorized agent of that person; and

  (C) is not made in concert with, or at the request or suggestion of, any candidate, or any authorized committee or agent of the candidate.

Ark.CodeAnn. § 7–6–201(13) (Supp.1997). Any independent expenditure committee is prohibited under the Act from accepting any contribution in excess of $500 from any person in any calendar year. Ark.Code. Ann. § 7–6–203(k) (Supp.1997).

■ When considering whether a contribution limitation unconstitutionally infringes freedom of speech, this court's task is to "decide whether the provision in question actually burdens the exercise of political

speech and, if it does, whether it is narrowly tailored to serve a compelling state interest." *Shrink Missouri Government. PAC v. Maupin*, 71 F.3d 1422, 1424 (8th Cir.1995), *cert. denied*, 518 U.S. 1033, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996) (internal quotation marks and citations omitted). The Supreme Court has made it clear that "state-enforced limits on campaign contributions and expenditures stifle First Amendment freedoms." *Day v. Holahan*, 34 F.3d 1356, 1365 (8th Cir.1994) (*citing Buckley v. Valeo*, 424 U.S. 1, 19, 22, 96 S.Ct. 612, 634, 636, 46 L.Ed.2d 659 (1976)). The Court explained in *Buckley:*

contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by people."

*Buckley*, 424 U.S. at 14, 96 S.Ct. at 632 (*quoting Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)). Because fundamental interests are involved, contribution limits are "subject to the closest scrutiny." *Carver v. Nixon*, 72 F.3d 633, 636 (8th Cir.1995), *cert. denied*, 518 U.S. 1033, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996) (citation omitted).

■ There is no question that the $500 limitation on contributions to independent expenditure committees burdens the exercise of political speech. Therefore, the question before the court is whether a genuine issue of material fact exists as to whether the $500 limit is narrowly tailored to serve a compelling state interest. The Supreme Court has identified the only permissible "compelling state interest" as "the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." *Buckley*, 424 U.S. at 25, 96 S.Ct. at 638.

Defendants rely on the Supreme Court's opinion in *California Medical Association v. Federal Election Commission*, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981), for the justification of the $500 limitation. In essence, defendants assert that the $500 limit is needed to prevent corruption in Arkansas' political process and to prevent candidates from giving a political *quid pro quo* for independent expenditures.

In *California Medical*, the Supreme Court upheld a provision of the Federal Election Campaign Act that imposes a $5,000 annual limit on the amount individuals can contribute to a political committee. The Court rejected the argument that because the contributions flow to a political committee, rather than to a candidate, the danger of actual or apparent corruption of the political process is not present. Indeed, the Court found that the contribution restriction furthered the governmental interest in preventing the actual or apparent corruption of the political process because without such a limitation, "an individual or association seeking to evade the $1,000 limit on contributions to candidates could do so by channelling funds through a multicandidate political committee." *California Medical*, 453 U.S. at 198, 101 S.Ct. at 2723.

The Court also held that the limitation was "an appropriate means by which Congress could seek to protect the integrity of the contribution restrictions upheld by [the] Court in *Buckley*." *Id.*, at 199, 101 S.Ct. at 2723. Defendants in the present case assert that without the $500 limitation imposed by the Act, a few powerful independent expenditure committees would be able to garner financial support at an unbridled rate and could use their financial wealth to corrupt the political process.

Plaintiffs contend, however, that a contribution to an independent expenditure committee cannot legally be channeled to the candidate, and, thus, the danger of corruption or the appearance of corruption does not exist. In other words, plaintiffs assert that a contributor cannot evade the candidate contribution limits by contributing money to an independent expenditure committee because an independent expenditure committee uses its funds to make independent expenditures—without arrangement, cooperation or consultation between the candidate or his committee. Thus, plaintiffs contend that defendants' argument that the $500 limit deters corruption by preventing persons from circumventing the candidate contribution limits is inaccurate. Plaintiffs argue that contributions to PACs may implicate the state's interest in preventing such corruption, however, contributions to independent expenditure committees do not.

Plaintiffs cite to Justice Blackmun's concurring opinion in *California Medical* where he suggested that the Court's analysis with respect to the constitutionality of the $5,000 contribution limitation to multicandidate political committees may be different if the limitation were placed on contributions to committees established for the purpose of making independent expenditures. Specifically, Justice Blackmun stated that:

> [b]y definition, a multicandidate political committee ... makes contributions to five or more candidates for federal office. Multicandidate political committees are therefore essentially conduits for contributions to candidates, and as such they pose a perceived threat of actual or potential corruption. In contrast, contributions to a committee that makes only independent expenditures pose no such threat.

*California Medical*, 453 U.S. at 203, 101 S.Ct. at 2725 (Blackmun, J. concurring).

We pointed out in out first opinion that under the Act, a person or group of persons are not prohibited from registering themselves as both an independent expenditure committee and a PAC. Thus, if the same person or organization registers with the Secretary of State as both an independent expenditure committee and a PAC, then it is possible that contributions made to such an organization may be channeled to a candidate.

Plaintiffs argue, however, that the court's concern that contributions to independent expenditure committees may be channeled to candidates is not valid—especially in light of the Eighth Circuit's opinion in *Russell*. Specifically, plaintiffs point out that the Eighth

Circuit struck down the $200 limit to PAC's as unconstitutional. Thus, there is no longer any limit on the amount a person may contribute to a PAC and the motivation for channeling money through an independent expenditure committee to a PAC, and ultimately to a candidate or for a candidate's benefit, has disappeared.

Moreover, plaintiffs assert that there is no danger of a political *quid pro quo* for contributions to independent expenditure committees because those committees are prohibited by statute from coordinating their expenditures with a candidate. The Supreme Court in *Buckley* stated that:

> [u]nlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate.

*Buckley,* 424 U.S. at 47, 96 S.Ct. at 648. The Eighth Circuit in *Russell* similarly held that contributions to PACs present less of a danger of *quid pro quo* than contributions given directly to candidates because PACs themselves do not "wield legislative power." *Id.,* 146 F.3d at 571.

The Eighth Circuit has made it clear that the state has the burden of proving that it had a compelling interest in enacting contribution limitations by proving that there is a real or perceived corruption in the political process attributable to large political contributions. (*Shrink Missouri Government PAC v. Adams,* 161 F.3d 519 (8th Cir.1998) "*Shrink 2*"). Specifically, the court held that it required "some demonstrable evidence that there were genuine problems that resulted from contributions in amounts greater than the limits in place." *Id.,* at 520 (*citing Russell,* 146 F.3d at 568). We are hard pressed to find any such "demonstrable" evidence in

the record before us that large contributions to independent expenditure committees has attributed to actual or perceived corruption in Arkansas' political process. Assuming, however, that a genuine issue of material fact exists as to whether the state had a compelling interest, it still must demonstrate that the $500 limit is narrowly tailored to serve that interest. *See Shrink 2,* at 522. We believe that as a matter of law it is not.

In *Shrink 2,* the court compared the $1,075, $575 and $275 contribution limits imposed by Missouri's campaign finance laws with the $1,000 limit approved in *Buckley.* The court concluded that after inflation, Missouri's limits were " 'too low to allow meaningful participation in protected political speech and association, and thus ... not narrowly tailored to serve' the alleged interest." *Id.,* at 522 (*quoting Day,* 34 F.3d at 1356).[3] The court held that the difference between the limits were not " 'distinctions in degree' but 'differences in kind.' " *Id.* (*quoting Buckley,* 424 U.S. at 30, 96 S.Ct. at 640). In *Buckley,* the Supreme Court held that courts have no "scalpel to probe" whether a different limitation amount might serve the state's interest, and that such "distinctions in degree become significant only when they can be said to amount to differences in kind." *Buckley,* 424 U.S. at 30, 96 S.Ct. at 640.

Similarly, in Russell, in striking down the Act's $200 limit to PACs, the court held that the $200 limit was "so low as to be different in kind from the limit approved in *Buckley.*" *Russell,* 146 F.3d at 571. The court stated that the $200 limit (in 1998 dollars) was equal to no more than 8 percent of the contribution limit in *Buckley.* The $200 limit was also less than 5 percent, before any adjustment for inflation, of the $5, 000 limitation approved by the Supreme Court in *California Medical.*

The $500 limit in this case is only 10 percent of the contribution limit approved in *California Medical* before any adjustment for inflation. The Eighth Circuit has struck down similar contribution limits both in *Rus-*

---

**3.** Judge John R. Gibson dissented in *Shrink 2* and pointed out that the Supreme Court in *Buckley* never established $1,000 as "the constitutional floor for permissible contribution limitations."

*Shrink 2,* at 525. Moreover, he noted that the Court has never required that current contribution limits be evaluated after adjusting for inflation.

*sell* and in *Shrink 2* as being too low to allow meaningful participation in the political process. Therefore, based on the precedent cited, we hold that the $500 limit is unconstitutional as a matter of law because it is too low to allow meaningful participation in the political process and, thus, is not narrowly tailored to serve the state's alleged compelling interest.

### B. Disclosure Requirement for Independent Expenditures

■ Under the Act, "[a]ny person making an independent expenditure shall name and identify itself ... in all of its communications with the public concerning any candidate and such communications must include ... the following notice: 'This communication is not authorized by any candidate or candidate committee.' " Ark.Code Ann. § 7–6–221(a) (Supp.1997). As stated above, an independent expenditure is any expenditure which is not a contribution and "expressly advocates the election or defeat of a clearly identified candidate for office" and is made without any cooperation between the candidate and the person making the expenditure. Ark.Code Ann. § 7–6–201(13) (Supp.1997).

Plaintiffs contend that § 7–6–221 infringes upon their First Amendment rights.[4] Specifically, plaintiffs assert that the provision compels speech and thus is abhorrent to the First Amendment. Plaintiffs contend that there is no compelling state interest for the disclosure requirement, and even if a compel-

ling state interest does exist, it is not narrowly tailored to meet the state's need.

Plaintiffs rely on the United States Supreme Court's decision in *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). The issue before the Court in *McIntyre* was "whether an Ohio statute[5] that prohibit[ed] the distribution of anonymous campaign literature [was] a 'law ... abridging the freedom of speech' within the meaning of the First Amendment." *Id.*, 514 U.S. at 336, 115 S.Ct. at 1514 (footnote and citations omitted).

The Court in *McIntyre* recognized that an "author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.*, 514 U .S. at 342, 115 S.Ct. at 1516. The freedom to publish anonymously "extends beyond the literary realm" and "encompasses documents intended to influence the electoral process." *Id.*, 514 U.S. at 342–344, 115 S.Ct. at 1516–19. "When a law burdens core political speech, we apply exacting scrutiny, and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *Id.*, 514 U.S. at 347, 115 S.Ct. at 1519 (internal quotation marks and citation omitted).

The disclaimer required by Arkansas Code § 7–6–221 clearly implicates plaintiffs' First Amendment right to free speech. As a result, we must apply strict scrutiny and grant plaintiffs' motion for summary judgment if we find that no genuine issue of material fact

---

**4.** Plaintiffs also contend that § 7–6–220 is unconstitutional and move for summary judgment on their claim. Section 7–6–220 contains the reporting requirements for independent expenditures and plaintiffs contend that the requirements are too broad and, thus, are unconstitutional under *Buckley*. The court will not address this issue because it has not been raised until this point. Plaintiffs did not include their claim that § 7–6–220 is unconstitutional in their verified complaint, or their amended complaint, nor was it addressed by plaintiffs in their original motion for summary judgment. Moreover, defendants have not addressed the issue in their response.

**5.** The relevant portion of the Ohio statute provided that:

No person shall write, print, post, or distribute ... a notice, placard, dodger, advertisement, sample ballot, or any other form of general publication which is designed to promote the nomination or election or defeat of a candidate, or to promote the adoption or defeat of any issue, or to influence the voters in any · election, or make an expenditure for the purpose of financing political communications through newspapers, magazines, outdoor advertising facilities, direct mailings ... unless there appears on such form of publication in a conspicuous place ... the name and residence or business address of the chairman, treasurer, or secretary of the organization issuing the same.

Ohio Rev.Code Ann. § 3599.09(A) (Banks–Baldwin 1988) (*amended by* Ohio Rev.Code Ann. § 3517.20 (Banks–Baldwin 1995)).

exists regarding whether § 7–6–221 is narrowly tailored to serve a compelling state interest. It is the state's burden to demonstrate that it had a compelling state interest and that the statute is narrowly drawn to meet that interest.

The state in *McIntyre* argued that the disclosure requirement in Ohio Rev.Code Ann. 3599.09(A) was justified by two compelling state interests: (1) providing its electorate with relevant information; and (2) preventing fraudulent and libelous statements. *Id.*, 514 U.S. at 348, 115 S.Ct. at 1519. The Court held that Ohio's interest in providing its electorate with relevant information was *"plainly insufficient* to support the constitutionality of its disclosure requirement." *Id.*, 514 U.S. at 349, 115 S.Ct. at 1520 (emphasis added). The Court accepted Ohio's interest in preventing fraud and libel as a legitimate interest, however, the court was not persuaded that it justified " § 3599.09(A)'s extremely broad prohibition."[6] *Id.*, 514 U.S. at 351, 115 S.Ct. at 1521. In holding so, however, the Court acknowledged that the state's interest may justify "a more limited identification requirement." *Id.*, 514 U.S. at 353, 115 S.Ct. at 1522.

The state in *McIntyre* also argued that the Court's decision in *Buckley* supported the constitutionality of § 3599.09(A)'s broad disclosure requirement. The Court rejected the state's argument and held that *Buckley* was not controlling. In *Buckley*, the Court upheld Section 434(e) of the Federal Election Campaign Act which required every person (other than a political committee or candidate) who made expenditures aggregating over $100 in a calendar year to file a statement with a Federal Election Commission.[7] *Buckley*, 424 U.S. at 75, 96 S.Ct. at 661. The Court in *Buckley* recognized that disclosure requirements play an important role in the enforcement of contribution and expenditure limitations:

> [s]ection 434(e) is a part of Congress' effort to achieve "total disclosure" by reaching "every kind of political activity" in order to insure that the voters are fully informed and achieve through publicity the maximum deterrence to corruption and undue influence possible. The provision is responsive to the legitimate fear that efforts would be made, as they had been in the past, to avoid the disclosure requirements by routing financial support of candidates through avenues not explicitly covered by the general provisions of the [federal] Act.

*Id.*, 424 U.S. at 76, 96 S.Ct. at 662 (footnotes omitted). Thus, the Court in *Buckley* held that the government's interest in providing its electorate with relevant information in order to prevent actual or perceived corruption is a compelling state interest.

However, as the Court in *McIntyre* recognized, the disclosure requirement in *Buckley* required nothing more than an identification to the Federal Election Commission on a report of the amount and use of money independently expended in support of a candidate. In contrast, the statute in *McIntyre*, like the Arkansas statute, imposes a much greater burden on a person's right to free speech. As the court put it: "[t]hough such mandatory reporting undeniably impedes protected First Amendment activity, the intrusion is a far cry from compelled self-identification on all election-related writings." *McIntyre*, 514 U.S. at 355, 115 S.Ct. at 1523.

Therefore, the Court in *McIntyre* held that the Ohio statute was unconstitutional: "[n]ot only is the Ohio statute's infringement on speech more intrusive than the *Buckley* disclosure requirement, but it rests on different

---

**6.** The Court accepted Ohio's submission that its interest in preventing fraud and libel "carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large." *Id.*, 514 U.S. at 349, 115 S.Ct. at 1520. The Court concluded, however, that the state had enacted other statutes to combat fraud and libel in candidate elections and, thus, was not relying solely on § 3599.09(A) to protect its interest. Therefore, the Court reasoned, even though Ohio's interest was legitimate, the Court was not persuaded that it justified § 3599.09(A)'s extremely broad prohibition.

**7.** Under the Act, Arkansas now has a similar reporting requirement that requires any person who makes an independent expenditure in excess of $500 to file a similar report with the Secretary of State. Ark.CodeAnn. § 7–6–220 (Supp.1997). As we stated, however, we decline to address the constitutionality of this provision.

and less powerful state interests." *Id.*, 514 U.S. at 356, 115 S.Ct. at 1523. The Court also held that the Ohio statute was not narrowly drawn, recognizing that the *Buckley* statute only regulated candidate elections, while the Ohio statute regulated referenda and other issue-based ballot measures. *Id.* In conclusion, the Court stated:

> [i]n candidate elections, the Government can identify a compelling state interest in avoiding the corruption that might result from campaign expenditures. Disclosure of expenditures lessens the risk that individuals will spend money to support a candidate as a *quid pro quo* for special treatment after the candidate is in office. Curriers of favor will be deterred by the knowledge that all expenditures will be scrutinized by the Federal Election Commission and by the public for just this sort of abuse.... In short, although *Buckley* may permit a more narrowly drawn statute, it surely is not authority for upholding Ohio's open-ended provision.

*Id.*, 514 U.S. at 356, 115 S.Ct. at 1523–24 (footnotes omitted).

In our previous opinion denying plaintiffs' motion for summary judgment, we found the Sixth Circuit's reasoning in *Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637 (6th Cir.) *cert. denied*, —— U.S. ——, 118 S.Ct. 162, 139 L.Ed.2d 106 (1997), persuasive. In *Kentucky Right to Life*, the court upheld a disclosure statute that requires identification of the sponsor to be placed upon every expenditure which advocates the support of or defeat of a candidate.[8] The Sixth Circuit recognized that *McIntyre* and *Buckley* provided the parameters for its analysis on the issue and stated that:

> [t]he challenges presented in *Buckley* and *McIntyre* can best be characterized as two points on a continuum, with plaintiffs' challenge falling somewhere between them. *Buckley* balanced substantial government interests in combatting corruption in the political process against the First Amendment infringement of reporting requirements and concluded that those interests outweighed the limited infringement. *McIntyre* then applied the reasoning of *Buckley* and concluded that the additional First Amendment burdens exacted by requiring identification disclaimers on issue advocacy expenditures outweighed the state's more limited interest in identifying proponents of issue advocacy.

*Id.*, 108 F.3d at 647–48.

The Sixth Circuit continued by recognizing that Kentucky, like the government in *Buckley*, had a substantial interest in notifying the public of the sources of expenditures along with preventing actual and perceived corruption. Further, the court realized that the Kentucky statute, like the statute in *McIntyre*, placed a more "onerous burden" on plaintiffs' First Amendment rights than the reporting requirements did in *Buckley*. Nevertheless, the court concluded that based upon the Supreme Court's holding in *Buckley*, Kentucky had shown substantial governmental interests and the identification disclaimer in § 121.190(1) was narrowly tailored to serve those goals. Specifically, the court held:

> The State asserts that § 121.190(1) prevents actual and perceived corruption by immediately notifying the public of any possible allegiance a particular candidate may feel toward the publisher. The State also asserts that it provides the Registry with a method of detecting those expenditures which are not truly independent by providing a paper trail to detect violations by unscrupulous PACs routing expenditures through individuals. Under *Buckley*, these are both substantial governmental interests. *Buckley*, 424 U.S. at 66–68, 96 S.Ct. at 657–58. Applying the analysis of *Buckley*, we believe the identification disclaimer for independent expenditures con-

---

8. Section 121.190(1) provides in relevant part:
   All newspaper or magazine advertising posters, circulars, billboards, handbills, sample ballots, and paid-for television or radio announcements with reference to or intended for, the support or defeat of a candidate, slate of candidates, or group of candidates for nomination or election to any public office shall be identified by the words "paid for by" followed by the name and address of the payer.
   Ky.Rev.Stat.Ann. § 121.190(1) (Banks–Baldwin 1995), *amended by* Ky.Rev.Stat.Ann. § 121.190(1) (Banks–Baldwin 1996 Acts Issue). *Kentucky Right to Life, Inc.*, 108 F.3d at 641 n. 9.

tained in § 121.190(1) is narrowly tailored toward achieving those goals.

*Id.,* 108 F.3d at 648.

Plaintiffs contend that this court's reliance on *Kentucky Right to Life* is problematic for two reasons. First, plaintiffs assert that in *Kentucky Right to Life,* the extent of the burden was self-identification. In other words, all that was required by the Kentucky statute was a "paid for by" statement followed by the name and address of the contributor. Plaintiffs contend that Arkansas' disclosure requirement goes well beyond the statute in *Kentucky Right to Life* by compelling speech in the form of an additional prominently displayed disassociation message.

Plaintiffs assert that even if the state has a compelling interest in providing information to prevent actual or perceived corruption, Arkansas' extensive reporting requirements adequately serve that interest. Therefore, plaintiffs contend that the additional burdens of § 7–6–221 should be struck down as unconstitutional.

Defendants assert that the plaintiffs are focusing on the wrong points. Defendants urge the court to focus "on the types of expenditures implicated not on the disclosures to be made." *Defendants' Brief,* at 17. Defendants contend that as long as the disclosure requirement effects only candidate advocacy, and not issue advocacy, the statute is within the parameters of *Buckley* and *McIntyre.* Defendants contend that by requiring the disclosure on the expenditure itself, the state's compelling interest in "holding up for *public* scrutiny the sources of support for, or opposition to, a candidate" is more effectively served. *Id.* Defendants assert that it is a more direct way of reaching the citizens who otherwise would not seek out the information.

In determining whether summary judgment is proper in this case, we must hold the defendants to their burden of proving that: (1) the state had a compelling interest in enacting the disclosure requirement; and (2) that the disclosure requirement is narrowly tailored to serve that interest. Moreover, under the law of this circuit, the defendants must come forward with "some demonstrable

evidence" that there were genuine problems that resulted from anonymous independent expenditures. *See Shrink 2,* at 522. Defendants have not come forward with any such evidence. Even if we concluded, however, that defendants had met their burden of proving that there was actual or perceived corruption in Arkansas' political process from independent expenditures, we do not believe that defendants have met their burden of proving that the disclosure requirement enacted to combat such corruption is narrowly tailored to serve that interest. We point out that defendants have cited to no case that has upheld a disclosure requirement that is as burdensome as Arkansas' statute.

We also reject plaintiffs' argument that as long as the disclosure requirement only affects candidate advocacy and not issue advocacy, the kind of disclosures to be made are immaterial. On the contrary, we believe that the Supreme Court's precedent and the Eighth Circuit's decisions on this issue require a analysis of the type of disclosure required. Indeed, if the disclosure required by the statute is not narrowly drawn to meet the state's interest, then it is unconstitutional. In this case, even if the self-identification requirement of § 7–6–221 is narrowly drawn, there is no evidence that the additional requirement of the disassociation message is narrowly tailored to serve the state's interest. In fact, the state has not come forward with any evidence that explains why the self-identification requirement is not enough to inform the electorate of the sources of support for or opposition to a candidate and an additional disassociation message is needed. Therefore, we conclude that defendants have failed to meet their evidentiary burden on this issue, and, thus, we must grant plaintiffs' motion for summary judgment and hold that § 7–6–221 is unconstitutional as a matter of law.

### C. 30 Day Black–Out Period

■ Arkansas Code § 7–6–203(g)(1) states that "[i]t shall be unlawful for the Governor, Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State, Attorney General, Commissioner of State Lands, and members of the General Assembly to

accept a contribution" 30 days before, during, and 30 days after any regular session of the General Assembly; during any extended session of the General Assembly; and during any special session of the General Assembly. Ark.CodeAnn. § 7–6–203(g)(1) (Supp.1997). The Act also makes it unlawful for any person to "promise a contribution" to an elected official during the 30 day period. Ark.Code. Ann. § 7–6–203(g)(2) (Supp.1997).

Plaintiffs contend that the black-out periods unconstitutionally infringe on their First Amendment rights to free speech. Specifically, plaintiffs assert that Arkansas Code § 7–6–203(g) is not narrowly tailored to serve a compelling state interest.

As we have stated, the right to free speech, including the right to political speech, is a fundamental right protected by the First Amendment. When a law burdens political speech, we must apply strict scrutiny, and uphold the restriction only if it is narrowly tailored to serve a compelling state interest.

The restriction at issue at this point, is not a monetary restriction or a disclosure requirement, but a restriction on the time when a contribution can be made to certain public officials. It is important to note at the outset that the black-out periods at issue in this case only apply to incumbents. In other words, non-incumbents are permitted to solicit and accept contributions during any regular session, extended session, or special session of the General Assembly.

An evaluation of a recent district court decision on this issue is beneficial in deciding plaintiffs' summary judgment motion. In *Shrink Missouri Government PAC v. Maupin*, 922 F.Supp. 1413 (E.D.Mo.1996) ("*Maupin 2*"), the court found that a Missouri statute that imposed black-out periods on all candidates running for public office unconstitutionally violated the plaintiffs' First Amendment rights to free speech and association because the statute was not narrowly tailored to serve a compelling state interest. *Id.*, at 1425.

In *Maupin 2*, the court found that the ban on accepting contributions during the regular session of the Missouri legislature constituted an infringement on political association and political communication because it prevented candidates from "amassing the resources necessary for effective advocacy." *Id.*, at 1420. Because the Missouri statute impinged on the plaintiffs' First Amendment rights, the court concluded that the statute must be narrowly tailored to serve a compelling state interest. The court accepted the state's interest in preventing corruption or the appearance of corruption as a compelling state interest. Likewise, in this case, defendants have asserted that the state has a compelling interest in preventing any corruption, or the appearance thereof, that might occur from large campaign contributions being given during a session of the General Assembly in return for a *quid pro quo* by the candidate-member.

The court determined that the Missouri statute was not narrowly tailored. In reaching that conclusion the court found that the defendants had failed to "adduce any evidence of actual corruption taking place due to acceptance by incumbents or non-incumbents accepting contributions during the Legislature's regular session. The harm that the defendants seek to eradicate must exist and its 'cure' must specifically be directed toward elimination of that harm." *Id.*, at 1420.

As in *Maupin 2*, defendants have not produced any evidence that actual corruption has taken place due to incumbents accepting contributions during a session of the General Assembly. In our first opinion, we held that it was the plaintiffs' burden, as the moving party, to demonstrate to the court that no genuine issues of material fact exist as to whether the state has a compelling interest and, that plaintiffs had failed to meet their burden on this issue. In light of the Eighth Circuit's opinion in *Shrink 2*, however, we believe it is the defendants that have the burden of proving that there was a compelling state interest and that the statute involved is narrowly tailored to serve that interest. In *Shrink 2*, the court reversed the district court's grant of summary judgment in favor of the defendants (the state) and ordered the court to enter summary judgment in favor of the plaintiffs (the PAC) on

the basis that the state had not meet its evidentiary burden. *Id.*, at 523.

Even if a compelling state interest exists, the restriction must be narrowly tailored to meet the state's need. The court in *Maupin 2* was troubled by the fact that the prohibition contained in the Missouri statute applied to "all officeseekers, incumbents and non-incumbents alike." *Id.*, 922 F.Supp. at 1422. The court reasoned that:

> [i]f its purpose is to curtail corruption or the appearance of corruption by eliminating financial *quid pro quo* contributions, the Court is hard-pressed to understand how this goal can be accomplished by applying the prohibition to non-incumbent candidates or even some public officials who are not subject to such a corrupting arrangement.

*Id.*

As defendants point out, Arkansas Code § 7–6–203(g) is more limited than the statute at issue in *Maupin 2*, *i.e.*, § 7–6–203(g) only applies to incumbents. Plaintiffs assert, however, that the statute is overinclusive. Indeed, plaintiffs contend that the statute prohibits all contributions, both large and small, during the specified periods. In addition, plaintiffs point out that the prohibition applies to office holders who are not part of the process of legislating.

█ It is well settled that only *large* contributions pose a threat of actual or perceived corruption in the political process. *See Russell*, 146 F.3d at 568–72. Thus, restrictions on contributions must be narrowly tailored to combat the actual or perceived corruption that occurs from large contributions.

Plaintiffs also assert that the black-out periods are not narrowly tailored because they apply to officer holders that are not involved in the political process. Namely, the blackout periods apply to the members of the General Assembly, the Commissioner of Lands, the Attorney General, the Auditor of the State, the Treasurer of the State, the Secretary of the State, the Lieutenant Governor and the Governor. Plaintiffs contend that with the exception of the Governor, only the members of the General Assembly could

affect the outcome of legislation. Thus, those are the only officer holders that could give a political *quid pro quo* to a contributor.

In *Russell*, the Eighth Circuit pointed out that there is less of a danger of *quid pro quo* corruption when a contribution is given to a PAC, rather than to a candidate, because PACs do not "wield legislative power." *Id.*, 146 F.3d at 571. We think the analysis is applicable in this case to the office holders that do not have legislative power. There is less of a danger of *quid pro quo* corruption from contributions made to office holders that do not "wield legislative power."

Defendants assert, however, that all of the officer holders are Arkansas' constitutional, executive officers, who present packages to the members of the General Assembly and are part of the legislative process. Thus, defendants contend that the blackout periods are not overinclusive.

Plaintiffs also contend that the statute is not narrowly tailored because it is underinclusive. Specifically, plaintiffs assert that corruption can occur at anytime, whether or not the General Assembly is in session. The district court in *Maupin 2* made the following comments about this problem:

> [the black-out provision] fails to recognize the reality that corruption can take place anytime, even outside the banned time-period. If corrupt practices can take place during the regular session, they can just as easily take place other times during the year. Defendants concede that the statute does not prohibit the solicitation of contributions during the legislative session. "A quid pro quo arrangement, if one existed, might very well take the form of an under-the-table or tacit I.O.U. to be redeemed after the session ends." Defendants fail to consider that "dangling a carrot" before a legislator is more apt to produce the desired effect than paying up front and hoping s/he carries out the contributor's wishes.

*Id.*, 922 F.Supp. at 1422 (citation omitted).

Plaintiffs also cite to *North Carolina Right to Life, Inc. v. Bartlett*, 3 F.Supp.2d 675 (E.D.N.C.1998), where the district court recently struck down a similar black-out provi-

sion. In Bartlett, the prohibition on contributions applied both to non-incumbents and incumbents. The court held that the ban was not narrowly tailored to serve the state's compelling interest based on three reasons:

> The prohibition ... applies to all candidates for office, both incumbents and non-incumbents. A statute seeking to avoid corruption or the appearance of corruption in the State legislature does not advance those purposes by limiting the fundraising of non-incumbent candidates for office. Additionally, the statute fails to account for the fact that political corruption may occur at anytime, whether or not the legislature is in session. Finally, the ban during legislative sessions is complete; it does not discriminate between large contributions with the potential to corrupt and small contributions with no such corruptive potential.

*Id.*, at 681. While it is true that Arkansas' black-out period only applies to incumbents, and, thus is narrowly tailored in that instance, it does not take into account the fact that corruption can occur any time, and that only large contributions pose a threat of corruption. We therefore conclude that as a matter of law, § 7–6–203(g) is not narrowly drawn to serve the state's compelling interest, and, thus, it is unconstitutional.

### IV. CONCLUSION

For the reasons stated, the court will grant plaintiffs' motion for summary judgment and enjoin enforcement of Arkansas Code Annotated §§ 7–6–203(k) (the $500 limit), 7–6–203(g) (the black-out periods), and 7–6–221(a) (the disclosure requirement). A separate order will be entered concurrently herewith.