Dear Senator Sweeden:
This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:
 1. May an incumbent member of the state Legislature solicit or receive a contribution for election to a statewide office, such as Attorney General, Governor, Lieutenant Governor or Treasurer, during an annual legislative session from a lobbyist or lobbyist principal as defined in 74 O.S. 2001, § 4249[74-4249]?
 2. May a registered lobbyist or lobbyist principal, as defined under 74 O.S. 2001, § 4249[74-4249], contribute, promise to contribute, solicit, or promise to solicit a campaign contribution for an incumbent member of the Oklahoma Legislature running for a statewide office, such as those listed in Question 1, during an annual legislative session?
 3. Does 21 O.S.Supp. 2008, § 187.1[21-187.1](G), which prohibits lobbyists and lobbyist principals from making or promising to make a contribution to a member of the Oklahoma Legislature or a candidate for legislative office during any regular legislative session and for five days thereafter, apply to all candidates for all statewide or legislative offices, even if the candidate is an incumbent statewide office holder or an incumbent member of Congress from Oklahoma?
 4. Is it a violation of 21 O.S.Supp. 2008, § 187.1[21-187.1](G) for an incumbent statewide office holder, or an incumbent member of Congress from Oklahoma who is running for state legislative office or statewide office, to solicit or receive a campaign contribution from a registered lobbyist or lobbyist principal, as defined in 74 O.S. 2001, § 4249[74-4249](k), during Oklahoma's annual legislative session? *Page 2 
 5. May a non-incumbent candidate for state legislative office solicit or receive a contribution from a registered lobbyist or lobbyist principal, as defined in 74 O.S. 2001, § 4249[74-4249], during the annual legislative session?
 6. May a registered lobbyist or lobbyist principal, as defined in 74 O.S. 2001, § 4249[74-4249], contribute, promise to contribute, solicit, or promise to solicit a campaign contribution for non-incumbent candidates for the Oklahoma House of Representatives, the Oklahoma State Senate or for any statewide elective office during the course of the annual legislative session?
 7. Does 21 O.S.Supp. 2008, § 187.1[21-187.1](G) violate the First Amendment and/or the Equal Protection Clause of the 14th Amendment to the U.S. Constitution?
 8. Does 21 O.S.Supp. 2008, § 187.1[21-187.1](G) violate the civil rights of individuals under the 14th Amendment of the U. S. Constitution by restricting an individual's constitutional right to participate in the democratic process through a voluntary monetary contribution to a candidate for public office?
 9. Does 21 O.S.Supp. 2008, § 187.1[21-187.1](G) unfairly discriminate between incumbent and non-incumbent candidates for a state legislative office or a statewide elected office?
 10. Is 21 O.S.Supp. 2008, § 187.1[21-187.1](G) unconstitutional and unenforceable by the State of Oklahoma and/or any of its subdivisions?
 INTRODUCTION
All of your questions relate to Section 187.1(G) of Title 21, which imposes time, place and manner restrictions on giving or promising to give, or soliciting campaign contributions during any regular legislative session, and for five (5) calendar days following the session's final adjournment. Your questions fall into two general categories: (1) questions about the statute's application, and (2) questions about the constitutionality of the statute's restrictions. We will first deal with the statute and its application.
 I. APPLICATION OF SECTION 187.1(G)'S RESTRICTIONS
The provision you inquire about, 21 O.S.Supp. 2008, § 187.1[21-187.1](G), in its entirety reads as follows:
 G. No lobbyist or lobbyist principal as defined in Section 4249 of Title 74 of the Oklahoma Statutes shall make or promise to make a contribution to, or *Page 3 solicit or promise to solicit a contribution for a member of the Oklahoma Legislature or a candidate for a state legislative office
during any regular legislative session, beginning the first Monday in February, through its adjournment, and for five (5) calendar days following sine die adjournment. A member of the Oklahoma Legislature or a candidate for a state legislative office shall not intentionally solicit or accept a contribution from a lobbyist or lobbyist principal as defined in Section 4249 of Title 74 of the Oklahoma Statutes during any regular legislative session and for five (5) calendar days after sine die adjournment. For the purposes of this subsection, a candidate shall mean any person who has filed a statement of organization for a state legislative office pursuant to Oklahoma Statutes, Title 74, Chapter 62 Appendix, Rule 257:10-1-8.
Id. (emphasis added).
As we noted in Attorney General Opinion 09-11, in which we concluded that the prohibitions of Section 187.1(G) did not apply to soliciting or accepting contributions from political action committees:
 Subsection G of Section 187.1 imposes a set of companion prohibitions which mirror each other, one set applying to the behavior of lobbyists and lobbyist principals, the other applying to legislators and candidates for legislative office:
 1. Prohibitions Against Giving
 Prohibitions on lobbyists and lobbyist principals that they not "make or promise to make a contribution to, or solicit or promise to solicit a contribution for a member of the Oklahoma Legislature or candidate for a state legislative office."
 2. Prohibitions Against Receiving
 Prohibitions on legislators and candidates for legislative office requiring that they "not intentionally solicit or accept a contribution from a lobbyist or lobbyist principal."
A.G. Opin. 09-11, *8.
A. Restrictions Placed on Members of the Legislature andCandidates for Legislative Office
We begin our analysis of the Section's application by considering the prohibitions imposed upon Legislators and candidates for legislative office. In construing statutory enactments, "[t]hefundamental rule of statutory construction is to ascertain and, if possible, give effect to the intention and purpose ofthe Legislature as expressed in the statute."Jackson v. Indep. Sch. Dist. *Page 4 No. 16,648 P.2d 26, 29 (Okla. 1982) (emphasis added) (footnote omitted). Further, when considering the construction of a statute, "the primary consideration is to ascertain the legislative intent,and this must be determined from the language used. And, the general rule is that nothing may be read into a statute whichwas not within the manifest intention of the legislature asgathered from the language of the act." Stemmons,Inc. v. Universal C.I.T. Credit Corp.,301 P.2d 212, 216 (Okla. 1956) (emphasis added).
As the language used in Subsection G of Section 187.1 makes clear, the prohibitions against soliciting and acceptingcontributions are imposed upon two classes of individuals:
 1. Members of the Oklahoma Legislature, and
 2. Candidates for state legislative office.
Thus, during the statutory blackout period — during the regular legislative session and for five (5) calendar days following sine die adjournment — it is only the members of these two classes to whom the section's prohibitions against accepting contributions apply. Accordingly, the prohibitions would not apply to any other office holders or candidates for other offices, unless they also happen to fall into one of the two classes to whom the prohibitions apply: members of the Legislature and candidates for the Legislature.
Thus, the prohibitions on accepting and soliciting contributions in Section 187.1(G) do not apply to a candidate forstatewide elective office, unless that candidate happens to also be an incumbent member of the Oklahoma Legislature. In such an instance it would not be the candidacy for statewide elective office that triggers the statute's application; rather, it would be the candidate's status as an incumbent member of the Legislature.
Similarly, the statute's prohibitions on receiving and accepting contributions would not apply to incumbent statewideoffice holders unless they also happen to be candidates for legislative office. Again, in such an instance, it wouldnot be the status of incumbent statewide office holder that would trigger the statute's application, but rather the status as candidate for legislative office.
In sum, the prohibitions on the receiving side of contributions apply to:
 1. Incumbent legislators — regardless of whether the contributions are in a race for reelection or for some other state or county position, [1] *Page 5 
 2. Candidates for state legislative office — regardless of any position or office they may presently hold, and
 3. Do not apply to a candidate for non-Legislative office unless, coincidentally, the candidate for such office also happens to be an incumbent member of the Legislature.
B. Restrictions Placed on Lobbyists and LobbyistPrincipals.
The mirror-image prohibitions imposed upon lobbyists and lobbyist principals thus apply to soliciting or giving contributions to (1) incumbent legislative members — regardless of the state or county office for which the incumbent Legislator is running, including a run for a statewide elected office, and (2) to candidates for legislative office, regardless of the present positions those candidates may hold, including incumbent statewide office holders and incumbent members of Congress.
The solicitation restrictions imposed on lobbyists and lobbyist principals would not attach to an incumbent statewide office holder, unless the incumbents were also coincidentally a candidate for state legislative office.
 II. CONSTITUTIONALITY OF SECTION 187.1(G)'S RESTRICTIONS INTRODUCTION
By its very nature the consideration of the constitutionality of a statute in an Attorney General Opinion is limited, because unlike a court, an Attorney General Opinion does not consider or make rulings on factual issues; Attorney General Opinions are limited to "questions of law." 74 O.S. 2001, § 18b[74-18b](A)(5). Accordingly, the consideration of the constitutionality of a statute in an Attorney General Opinion is limited to consideration of the facial constitutionality of the statutory enactment, and cannot include whether the statute is constitutional as applied to a particular fact situation.
Further, like courts, in considering a statute's constitutionality, the Attorney General is guided by well-established principles that "[a] heavy burden is cast on those challenging a legislative enactment to show its unconstitutionality and every presumption is to be indulged in favor of the constitutionality of a statute." Assessments of Certain Real Prop.Owned by Askins Prop., L.L.C., v. Okla. County Assessor,161 P.3d 303, 310 (Okla. 2007) (citation omitted). Accordingly, "a duly-enacted statute will be presumed to conform to the state and federal Constitutions and will be upheld *Page 6 
unless it is clearly, palpably and plainly inconsistent with the Constitution." Liddell v. Heavner,180 P.3d 1191, 1200 (Okla. 2008) (footnote omitted).
It is in light of the limited scope of a constitutional review in an Attorney General Opinion and these presumptions of constitutionality that we address your constitutional concerns with Section 187.1(G)'s restrictions. *Page 7 
A. First Amendment Issues
The restrictions on receiving and giving political contributions contained in Section 187.1(G) are not absoluteprohibitions. Rather, the section establishes a temporal limit on such activities, and imposes what are referred to inFirst Amendment jurisprudence as "time, place and manner restrictions."
In Buckley v. Valeo, 424 U.S. 1 (1976), the United States Supreme Court, in discussing the constitutionality of monetary caps placed on political contributions, concluded that "time, place and manner" cases, such as Adderley v.Florida, 385 U.S. 39 (1966), Cox v. Louisiana,379 U.S. 559 (1965), and Kovacs v. Cooper, 336 U.S. 77 (1949), and the constitutional principles adopted in those cases, didnot form the appropriate basis for analyzing the issues before it. Id. at 17-18. Buckley found that the monetary restrictions imposed on contributions were in addition to any time, place and manner restrictions:
 The critical difference between this case and those time, place, and manner cases is that the present Act's contribution and expenditure limitations impose direct quantity restrictions on political communication and association by persons, groups, candidates, and political parties in addition to any reasonable time, place, and manner regulations otherwise imposed.
Id. at 18 (emphasis added) (footnote omitted).
Because of the difference between time, place and manner restrictions and the quantity restrictions imposed on political contributions limits in Buckley, the Supreme Court used a more restrictive analysis in considering dollar limits imposed on campaign contributions.
In the case at hand, we are asked to consider not a dollar limitation imposed upon political contributions, but a limit on the time period in which political contributions by lobbyists and lobbyist principals may be given and received. To date, however, both federal and state courts considering such temporal limitations on campaign contributions have not considered them under the less stringent requirements applied to time, place and manner restrictions imposed upon First Amendment rights. Rather, the courts have applied the strict scrutiny analysis used by the United States Supreme Court in analyzing monetary limits on campaign contributions established in Buckley.
Further, to date only one circuit court, the United States Court of Appeals for the Fourth Circuit, has considered the constitutionality of temporal limits on campaign contributions. The temporal restrictions were considered by the Court of Appeals inNorth Carolina Right to Life, Inc. v. Bartlett,168 F.3d 705, 714-19 (4th Cir. 1999) cert. denied528 U.S. 1153 (2000). In Bartlett, the Circuit Court of Appeals struck down as unconstitutional a North Carolina statute that defined "political committee" to encompass groups engaging only in issue advocacy and that subjected such groups to intensive reporting requirements. Bartlett also struck down a state statute prohibiting corporate contributions or expenditures for political purposes as overbroad, but upheld
the North Carolina *Page 8 statute prohibiting lobbyists and political committees employingthem from giving contributions during the legislative session.Id. at 714. The North Carolina statute upheld inBartlett was described by the court as follows:
 Section 163-278.13B prohibits a lobbyist, a lobbyist's agent, or a political committee that employs a lobbyist from contributing to a member of or candidate for the North Carolina General Assembly or Council of State while the General Assembly is in session. It also prohibits candidates or incumbents from soliciting lobbyists or political committees that employ them during the session. Violation of these restrictions carries a criminal penalty.
Id. at 714 (emphasis added) (citations omitted).
In discussing the temporary restrictions imposed on lobbyists, their agents and employers during the legislative session,Bartlett noted that lobbyists, their agents and their employers are free to make contributions during the rest of the year and free during the entire year to engage in political speech:
 Moreover, the Supreme Court has long noted that restrictions on political contributions are constitutionally less problematic than are, for instance, restrictions on independent expenditures. See Buckley, 424 U.S. at 20-21, 96 S.Ct. 612. This lesser concern springs from the fact that contribution limits typically "entail[] only a marginal restriction upon the contributor's ability to engage in free communication." Id. Such is the case here. North Carolina's restrictions do nothing more than place a temporary hold on appellees' ability to contribute during the General Assembly session, leaving them free to contribute during the rest of the calendar year and to engage in political speech for the entire year.
Id. at 715 (emphasis added).
In analyzing the statute, Bartlett applied the strict scrutiny analysis developed in Buckley, under which restrictions on contributions may be sustained if they advance a significant state interest and are closely drawn to avoid unnecessary abridgment of associational freedoms. Id. InBuckley, the United States Supreme Court described in detail the nature of political contributions, and why limits on contributions would be upheld only if they advanced a significantly important state interest and employed means closely drawn to avoid unnecessary abridgment of these freedoms. Buckley first discussed the general nature of political contributions, stating:
 By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate *Page 9 
the underlying basis for the support. . . . A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.
Buckley, 424 U.S. at 20-21 (emphasis added).
Then, Buckley briefly described the impact that limits on contributions could have upon a political campaign:
 Given the important role of contributions in financing political campaigns, contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy.
Id. at 21.
After holding that even a significant interference with protected rights of political association "may be sustained if the State demonstrates a sufficiently important interest and employsmeans closely drawn to avoid unnecessary abridgement ofassociational freedoms," id. at 25, Buckley found that two significant state interests justified the contested limits on campaign contributions: (1) "the actuality" [of corruption] and (2) "appearance of corruption resulting from large individual financial contributions." Id. at 26. In finding these to be significant state interests, the Court noted that the appearance of corruption was of almost equal concern with the danger of actualquid pro quo arrangements:
 Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions.
Id. at 27 (emphasis added).
In applying the reasoning in Buckley, the Bartlett Court found that the prohibitions against lobbyists contributions survived strict scrutiny because, like the contribution monetary caps inBuckley, the temporal restrictions against contributions during the legislative session imposed by North Carolina also served to prevent corruption and the appearance of corruption:
 North Carolina's contribution and solicitation restrictions also survive strict scrutiny because they advance a compelling state interest. Prohibiting lobbyist contributions and solicitations while the General Assembly is in session serves to prevent corruption and the appearance of corruption- "the only legitimate and *Page 10 
compelling government interests thus far identified for restricting campaign finances." FEC v. National Conservative PAC, 470 U.S. 480, 496-97, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985); see also Buckley v. American Constitutional Law Found., Inc., 525 U.S. 182, 119 S.Ct. 636, 648, 142 L.Ed.2d 599 (1999) (noting the risk of quid pro quo corruption "when money is paid to, or for, candidates").
Bartlett, 168 F.3d at 715 (emphasis added).
In evaluating the state's interests, Bartlett discussed the pressure on lobbyists during the legislative session, with the Court finding a genuine risk of both actual corruption and the appearance of corruption:
 In evaluating the state interest in this case, we find a genuine risk of both actual corruption and the appearance of corruption. With respect to actual corruption, lobbyists are paid to effectuate particular political outcomes. The pressure on them to perform mounts as legislation winds its way through the system. If lobbyists are free to contribute to legislators while pet projects sit before them, the temptation to exchange "dollars for political favors" can be powerful.
Id. at 715-16 (emphasis added) (citation omitted).
Further evaluating the genuine risk of actual corruption, theBartlett Court pointed to recent cases of political corruption:
 Illicit bargaining of this type is not limited to the old days when trusts shopped state legislatures like children in a candy store. More recent cases of improper activity, unfortunately, also exist. Indeed, courts have recognized instances of influence peddling, Maryland Right to Life State PAC v. Weathersbee, 975 F.Supp. 791, 797 (D.Md. 1997), political quid pro quos, United States v. Nelson, 486 F.Supp. 464, 468 (W.D.Mich. 1980), and other improper behavior on the part of legislators, United States v. Bailey, 990 F.2d 119, 121 (4th Cir. 1993) (detailing personal cash payments for support of pari-mutuel betting legislation); Kentucky Right to Life, Inc. v. Terry, 108 F.3d 637, 639 (6th Cir.) ("Numerous Kentucky public officials have been convicted of abusing their political offices for personal gain over the past twenty-five years."), cert. denied, 522 U.S. 860, 118 S.Ct. 162, 139 L.Ed.2d 106 (1997).
Id. at 716 (emphasis added).
After this discussion of actual corruption, Bartlett briefly touched on the appearance of corruption resulting fromlobbyists and their employers making contributions during thelegislative session: *Page 11 
 The appearance of corruption resulting from PAC and lobbyist contributions during the legislative session can also be corrosive. Even if lobbyists have no intention of directly "purchasing" favorable treatment, appearances may be otherwise. The First Amendment does not prevent states such as North Carolina from recognizing these dangers and taking reasonable steps to ensure that the appearance of corruption does not undermine public confidence in the integrity of representative democracy. See Buckley, 424 U.S. at 26-27, 96 S.Ct. 612.
Id. (emphasis added).
Bartlett also considered the North Carolina statute in light of the requirement that the statute be narrowly tailored toaddress the dangers justifying its enactment.Id. at 716. The Court found that the challenged statute was narrowly tailored, because it was limited to lobbyists and thosewho employ them and because the restrictions were onlytemporary, as they applied only during the legislativesession — the period during which the risk of actual or an apparent quid pro quo is the highest:
 Toward these ends, North Carolina enacted narrowly tailored restrictions. First, the restrictions in section 163-278.13B are limited to lobbyists and the political committees that employ them-the two most ubiquitous and powerful players in the political arena. Second, the restrictions are temporally limited: they last only during the legislative session, which typically, though not invariably, has covered just a few months in an election year. In short, the restrictions cover only that period
during which the risk of an actual quid pro quo or the appearance of one runs highest.
Id. (emphasis added).
In this regard, we note that Oklahoma's statute, 21 O.S.Supp. 2008, § 187.1[21-187.1](G), is not like the statutes struck down in State v. Alaska Civil LibertiesUnion, 978 P.2d 597, 631 (Alaska 1999), Arkansas Right to LifeState Political Action Committee v. Butler,29 F. Supp. 2d 540, 553 (W.D. Ark. 1998), Shrink MissouriGovernment PAC v. Maupin,922 F. Supp. 1413, 1425 (E.D. Mo. 1996), and State v. Dodd,561 So. 2d 263, 267 (Fla. 1990), where the Legislatures had enactedtotal bans on giving or accepting any contributionsfrom any source during the legislative session. In contrast with those cases, both Section 187.1(G) and the statute considered in Bartlett were narrowly tailored. Their limitations apply not to all contributions from any source during the legislative session, but only to contributions by lobbyists and those who employ lobbyists.
Nor are we dealing with a statute that applies, as the Florida statute did, to all state elected officers — officers who have no part in the legislative process — which the Florida court found to be overbroad. Dodd, 561 So. 2d at 265. Rather, Section 187.1(G) applies only to sitting members of the Legislature and candidates for state legislative office. *Page 12 
The federal district court in Maupin found the statute before it overbroad because it applied not only to incumbent members of the Legislature, but also applied to candidates for legislative office.Id., 922 F. Supp. at 1422. Bartlett addressed this issue and came, we conclude correctly, to the opposite conclusion:
 Second, Holt and NCRLPAC claim the restrictions are not narrowly tailored because they prevent candidates for office from receiving contributions even though candidates are in no position to sell legislative outcomes. Appellees' argument might be persuasive were contributions to incumbents the only way to gain favorable treatment. But sticks can work as well as carrots, and the threat of contributing to a legislator's challenger can supply as powerful an incentive as contributing to that legislator himself.
Id., 168 F.3d at 716 (emphasis added).
Like the statute addressed in Bartlett by the Fourth Circuit Court of Appeals, the Oklahoma statute is not a prohibition on all contributions, but only temporarily prohibits contributions from lobbyists and those who hire them. Further, it applies only to incumbent legislators and candidates for legislative office. The prohibitions at no time prohibit the lobbyists and lobbyists' principals from engaging in political speech during the entire year, and only limits them from making the contributions during the legislative session and for five (5) days thereafter. Both lobbyists and their principals are free to make contributions for the rest of the year.
In upholding a statute similar to Section 187.1(G) against a constitutional challenge, the Vermont Supreme Court, inKimbell v. Hooper, 665 A.2d 44 (Vt. 1995), stated:
 If anything, the restrictions
in § 266(3) are less burdensome than the dollar limits upheld in Buckley, and do not compare to the total prohibition held unconstitutional in Fair Political Practices Comm'n v. Superior Court, 25 Cal.3d 33, 599 P.2d 46, 59, 157 Cal.Rptr. 855, 862 (1979), cert. denied, 444 U.S. 1049, 100 S.Ct. 740, 62 L.Ed.2d 736 (1980). Section 266(3) sets no overall limits. It functions solely as a timing measure, banning contributions to individual members only while the General Assembly is in session. The Act does not prohibit contributions to political parties during session, only those to individual legislators. Consequently, the limited prohibition focuses on a narrow period during which legislators could be, or could appear to be, pressured, coerced, or tempted into voting on the basis of cash contributions rather than on consideration of the public weal. The legislature has chosen a narrowly drawn measure to avoid a serious appearance of impropriety, and we see no reason to strike that measure down.
Id. at 51 (emphasis added). *Page 13 
Because we find that the restrictions against political contributions by lobbyists and lobbyist principals during the legislative session: (1) serve the compelling state interests of preventing corruption and the appearance of corruption, and (2) are narrowly drawn, we cannot conclude that they clearly, palpably and plainly violate the First Amendment's rights of free speech or association.
B. Equal Protection Issue
The Equal Protection Clause of the United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, Section 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne LivingCenter, 473 U.S. 432, 439 (1985). Under the Equal Protection Clause "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."Id. at 440.
This general rule, however, does not apply "when a statute classifies by race, alienage, or national origin," or when the state statue "impinge[s] on personal rights guaranteed by the Constitution." Id. In such cases the "laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." Id. InBuckley, the Supreme Court held that the primaryFirst Amendment problem raised by the challenged act's contribution limits "is their restriction of one aspect of the contributor's freedom of political association. The Court's decisions involving associational freedoms establish that the right of association is a `basic constitutional freedom.'" Id., 424 U.S. at 24-25. Because of the fundamental nature of the right of association,Buckley held that "governmental `action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.'" Id. (quoting NAACP v. Alabama,357 U.S. 449, 460-61 (1958)). Thus, in determining whether the restrictions of Section 187.1(G) facially comply with the Equal Protection Clause of the United States Constitution, we apply the strict scrutiny analysis, under which the classifications are required to serve a compelling state interest, and be narrowly drawn to serve that interest.
Bartlett considered an equal protection challenge lodged on the basis that the prohibitions applied to lobbyists and those who hire them, and not to the general population. In addressing this claim, the court noted that, as discussed in the preceding sections, "the State has advanced strong reasons for doing so-reasons that the Supreme Court has in fact expressly validated." Id.,168 F.3d at 717 (citation omitted).
Equal justifications exist for not including other state officers within the prohibition. Other state officers either play no part or have but a limited part in the legislative process, and thus are not similarly situated to incumbent legislators or those running for legislative office. In short, the compelling state interest and the narrow tailoring found sufficient in our First Amendment analysis also justify the Section's restrictions under an equal protection analysis. Accordingly we cannot conclude, as a matter of law, that Section 187.1(G) violates the Equal Protection Clause of the United States Constitution. *Page 14 
 III. CONCLUSION
Given that a statute more restrictive than ours has been upheld as constitutional by the only circuit court of appeals to address such statutes, and given that a similar statute has been upheld by the Vermont Supreme Court, we cannot conclude, based on the limited review of facial constitutionality permitted in an Attorney General Opinion, that the restrictions imposed by Section 187.1(G) are clearly, palpably and plainly unconstitutional. Therefore, we must presume that Section 187.1(G), like all the other enactments of the Legislature, is constitutional.
It is, therefore, the official Opinion of the Attorney Generalthat:
 1. The requirements of 21 O.S.Supp. 2008, § 187.1[21-187.1](G), that no lobbyist or lobbyist principal shall make or promise to make a contribution to or solicit or promise to solicit a contribution for a member of the Oklahoma Legislature, or a candidate for a state legislative office during any regular legislative session and for five days thereafter, and the companion requirement that members of the Oklahoma Legislature and candidates for the Legislature may not intentionally solicit or accept contributions from lobbyist and lobbyist principals during the same time period:
 a. Apply only to contributions to members of the Oklahoma Legislature and candidates for the Oklahoma Legislature;
 b. Apply to contributions to incumbent statewide elected offices (such as the Governor, Lieutenant Governor, Attorney General and Treasurer) and incumbent members of Congress only if such incumbents are also candidates for the Oklahoma Legislature. In such instances, it is the status as candidate for the Legislature that triggers Section 187.1's application, not the status as an incumbent office holder; and
 c. Apply to candidates for statewide elected office (such as candidates for Governor, Lieutenant Governor, Attorney General and Treasurer) or other state or county office only if the candidate is also a member of the Oklahoma Legislature. In such instances it is the status as member of the Legislature that triggers Section 187.1(G)'s application, not the status as a candidate for non-legislative office.
 3. Because of the effect that restrictions on political contributions have on First Amendment free speech and associational rights, such restrictions *Page 15 can survive constitutional challenge only if the restrictions: (1) serve compelling state interests, and (2) are narrowly tailored to avoid unnecessary abridgment of such rights.
 4. The United States Court of Appeals for the Fourth Circuit, in North Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705, 714-19 (4th Cir. 1999) cert. denied 528 U.S. 1153 (2000), upheld prohibitions on political contributions during the legislative session by lobbyists and those who employ them, finding that prohibiting lobbyist contributions and solicitations while the Legislature is in session: (1) served the compelling state interests of preventing both actual corruption and the appearance of corruption, and (2) the prohibitions were narrowly tailored, as they applied only to contributions by lobbyists and their employers — "the two most ubiquitous and powerful players in the political arena," and because the prohibitions were "only temporary" and were limited during the legislative session — the "period during which the risk of an actual quid pro quo or the appearance of one runs highest." Id. at 716. The Vermont Supreme Court, in Kimbell v. Hooper, 665 A.2d 44, 51 (Vt. 1995), came to a similar conclusion in upholding Vermont's prohibition on contributions during the legislative session.
 5. Given the courts' reasoning and conclusions in these cases, we cannot say, as a matter of law, that the restrictions on contributions in 21 O.S.Supp. 2008, § 187.1[21-187.1](G) are clearly, palpably and plainly inconsistent with the U. S. Constitution's First Amendment or the Equal Protection Clause of the Fourteenth Amendment. We therefore must presume that 21 O.S.Supp. 2008, § 187.1[21-187.1](G) conforms to both the state and federal Constitutions.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
NEAL LEADER SENIOR ATTORNEY GENERAL
[1] As we concluded in Attorney General Opinion 09-25, application of the restrictions of 21 O.S.Supp. 2008, § 187.1[21-187.1](G) to candidates for federal office are preempted by the provisions of the Federal Election Campaign Act of 1971, Pub.L. 92-225, 86 Stat. 3.
PGPage 1